**Margaret Mae CANTRELL et al., Plaintiffs-Appellees,**

v.

**FOREST CITY PUBLISHING CO., a corporation, et al., Defendants-Appellants.**

**No. 73–1081.**

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1973.

Decided Sept. 10, 1973.

Smith Warder, Cleveland, Ohio, for defendants-appellants; Arter & Hadden, Cleveland, Ohio, Sabin, Bermant & Blau, New York City, of counsel.

Harry Alan Sherman, Pittsburgh, Pa., for plaintiffs-appellees; Austin T. Klein, Krause, Klein, Fromson & Fuerst, Cleveland, Ohio, of counsel.

Before EDWARDS, PECK and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

In this diversity case a jury awarded damages to two private citizens in their action for invasion of privacy against the publisher of The Cleveland Plain Dealer, a reporter and a photographer. At the conclusion of the plaintiffs' case, in response to a motion for a directed verdict on behalf of all the defendants, the District Court found "that there has been no evidence to support the charges that the invasion of privacy, if in fact an invasion of privacy occurred was done maliciously within the legal definition of that term." The Court then ordered stricken all allegations relating to punitive damages, and dismissed as to several infant plaintiffs, but denied the motion for a directed verdict as to the two plaintiffs who are appellees. The issue is whether, having ruled that there was no evidence that the defendants had acted maliciously "within the legal definition of that term," the District Court should have granted a directed verdict. The defendants renewed their motion at the conclusion of all the evidence and made a timely motion for judgment notwithstanding the verdict or a new trial. All these motions were likewise denied. We reverse.

On December 15, 1967 a bridge across the Ohio River at Point Pleasant, West Virginia collapsed. Among the forty-four persons who lost their lives in this tragic accident was Melvin Aaron Cantrell, the 40-year old father of seven children. The "Silver Bridge disaster," as it was labeled by the press, was page one news throughout the country. The Cleveland Plain Dealer sent the defend-ant Joseph Eszterhas, a feature writer, to the scene and one of his dispatches which was published a few days later described the funeral of Melvin Cantrell. This story was written in the style of a news feature rather than a purely factual account. It dwelt upon the tragic consequences, rather than the details of the accident itself. The article focused on the condition of the Cantrell family as illustrating these consequences.

In early May 1968 Eszterhas and a Plain Dealer photographer, the defendant Richard T. Conway, returned to the Point Pleasant area to do a follow-up feature. Both newspapermen were off duty and operating free-lance. However, before they left Cleveland one of the editors of the Plain Dealer told them that if they came up with a good story the paper would buy it. After stopping for directions, Eszterhas and Conway went to the home owned by Margaret Cantrell, widow of Melvin, and occupied by her and six children ranging in age from 1 to 16 years. Mrs. Cantrell was not at home and a daughter, Dora, was the oldest child there. During a stay of one to one and one-half hours Conway took 50 pictures and Eszterhas talked with the children. There was little evidence as to whether the reporter and photographer were invited into the house. Dora did not testify, but William David Cantrell who was 13 at the time of the event and 17 at trial time, testified that he saw the men coming across the field and that the door to the house was open. He said no one asked them in and no one asked them to get out. He also said the door was open because the men were coming. William said he assumed the men were from a newspaper, but didn't ask which one. Neither he nor the other children made any objection to being photographed.

The Sunday Magazine of The Cleveland Plain Dealer for August 4, 1968 carried as its lead feature a story entitled, "Legacy of the Silver Bridge." The story by Eszterhas contained a number of inaccuracies and implied that Mrs. Cantrell was present in her home

when he returned to Point Pleasant in May. Five of Conway's pictures were printed with the story. In these pictures the Cantrell home appeared to be dirty and run down and the children were poorly clothed and untidy. The hopeless poverty of the family was emphasized in the feature. The reporter again used the condition of the Cantrell family to illustrate the consequences of the bridge disaster. In the more dramatic language of the article, "His death is a microcosm of the scar which will remain permanent and stark upon the spirit of the people here."

The assistant Sunday editor and assistant managing editor of the Plain Dealer testified that Eszterhas had a good reputation for accuracy of reporting at the time the 1968 article was published. In fact, he won three press awards for his coverage of the Silver Bridge collapse. Conway testified that the photographs fairly depicted the persons and scenes as he found them at the Cantrell residence. He did not suggest that the children make themselves or the home more tidy before the pictures were taken. Joseph Eszterhas did not testify. There was no evidence that Forest City Publishing Company had knowledge of any of the inaccuracies contained in the article.

The complaint alleged that the privacy of the plaintiffs had been violated by the intrusion of the newsman and photographer, for unreasonable publicity about their private lives and for falsely presenting their condition and making them objects of pity and ridicule. Mrs. Cantrell brought suit for herself and all of her children, but all plaintiffs except Mrs. Cantrell and one son, William David Cantrell, were dismissed by the Court. The complaint also charged the defendants with "malicious and defamatory libel." As developed by the evidence the intrusion complained of consisted of publication of an article which placed the Cantrell family in a bad light because of its inaccuracies and untruths. This is the way the matter was presented to the jury and there is no complaint

on appeal concerning the jury charge. On appeal the appellees attempt to treat the entry of the two defendants into their home without an invitation when only children were present as the intrusion for which damages were justified. However, this was not the theory on which the case was tried in the District Court.

Our search for the controlling principles in effect today begins with New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a civil libel action. In that case, the Supreme Court enunciated a federal rule, required by the Constitution, which denies recovery to a public official for defamatory falsehood concerning his official acts unless he proves actual malice, that is, that a statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 279–280, 84 S.Ct. at 726. The Court reasoned that to permit virtually unlimited libel judgment against critics of official conduct for failure to determine the truth of every assertion made would lead to a self-censorship by news media that would be as stifling to the widespread dissemination of information as official censorship. In Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the same requirement for recovery was applied to a prosecution for criminal libel based on statements made about public officials. Furthermore, the rule of *New York Times* was extended to cover false statements about anything which might relate to an official's fitness for office, not just his official conduct.

In Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), it was held that the term "public officials," for purposes of the *New York Times* rule, includes all government employees having, or appearing to have "substantial responsibility for or control over the conduct of governmental affairs." *Id.*, at 85, 86 S.Ct. at 676. It had been contended that the rule applied only to libel actions by elected officials. The same requirement for recovery has been ap-

plied to civil libel actions by candidates for public office, Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L. Ed.2d 35 (1971); Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971), and to cases where the plaintiff is a "public figure" rather than a public official. Greenbelt Cooperative Publishing Association, Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). In Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), recovery in a civil libel action for a defamatory falsehood contained in a broadcast was denied to a private citizen who was neither a "public official" nor a "public figure" where actual malice as defined in *New York Times* was not proven. The plurality opinion of three members of the Court extended the requirement of a showing of actual malice for recovery to matters of "public or general interest." 403 U.S. at 43, 91 S.Ct. 1811. In addition, this opinion required a standard of "clear and convincing proof" that the defamatory falsehood was published with knowledge that it was false or with reckless disregard for its truth or falsity which must be met to sustain a libel action against one within the protection of the First Amendment.

In the course of developing the scope of privilege conferred upon the news media with regard to actions seeking damages for libel and defamation, the Supreme Court was called upon to apply the *New York Times* principles to a case of invasion of privacy. In Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L. Ed.2d 456 (1967), recovery of damages under a New York right of privacy statute was not permitted in the absence of a showing that a false report of a newsworthy event was published either with knowledge of its falsity or in reckless disregard of its truth or falsity.

The case involved an article which appeared in Life magazine in February 1955 and was a highly fictionalized account of an ordeal experienced by the Hill family more than two years earlier when they were held hostage in their home for 19 hours by three escaped convicts. The Hills had moved to a different state and had discouraged all efforts by the media to keep them in the spotlight. The occasion for the article in Life was the opening in New York of a play, based on a novel which had appeared in 1953. Reports of a number of hostage incidents were used as source material by the novelist, and the Hill family was not identified in the novel or the play. The pictures which accompanied the Life article were taken at the former Hill residence where the incident had occurred, with actors portraying events which were quite different from the actual experiences of the Hills. These pictures indicated that the convicts has mistreated the family, whereas Mr. Hill had stated to newsmen immediately after the release of the family that there had been no violence, that no one was molested by their captors and that the family had been treated courteously.

■ One important difference between *Hill* and the present case is that the opening of the New York play was considered a matter of sufficient public interest to justify bringing the actual incident back into the news. 385 U.S. at 388, 87 S.Ct. 534. There is no evidence of any activity related to the "Silver Bridge disaster" which would have naturally rekindled public interest in the event. Nevertheless, the article complained of appeared less than nine months after the event and we believe the "journalistic judgment" of a newspaper publisher (Cf. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)) cannot be circumscribed by linking newsworthiness solely to the passage of time.

■ In their briefs the appellees seek to differentiate Time, Inc. v. Hill, *supra,* on the further ground that there was no physical intrusion by representatives of Life, whereas Eszterhas and Conway did intrude into the Cantrell home. The two newsmen may have been guilty of a trespass against the property of the Cantrells. However, the gravamen of this

action lies in the claim that the publication of the article, not the physical intrusion, damaged the plaintiffs. Appellees cite Dietemann v. Time, Inc., 449 F.2d 245 (9th Cir. 1971), for the proposition that the physical intrusion into their home is sufficient invasion of privacy to sustain the judgment. In *Dietemann* two reporters gained entrance to the home of the plaintiff by subterfuge, and took pictures with a hidden camera and recorded conversations by means of a hidden microphone. The Court held that the later publication of some of the pictures and printed matter based on the recordings did not immunize the publisher from responding in damages for the intrusion. The Court found that the invasion of privacy consisted of the clandestine photography and recording and that "publication is not an essential element of plaintiff's cause of action." 449 F.2d at 249. In her testimony Mrs. Cantrell claimed no injury from the entry of the two defendants on her premises, but testified that the article made her mad and upset her because of all the untruths it contained. On cross-examination she said that she objected to the Plain Dealer article for what it said, not because of the publicity. Here publication was clearly an essential element of the cause of action.

In Varnish v. Best Medium Publishing Co., 405 F.2d 608 (2d Cir. 1968), cert. denied, 394 U.S. 987, 89 S.Ct. 1465, 22 L.Ed.2d 762 (1969), relied upon by plaintiffs, the Court specifically found that the evidence of invasion of privacy was sufficient to establish that an article containing falsehoods was published with knowledge of its falsity or in reckless disregard for truth. In the present case the District Judge made a finding that there was no evidence to support the claim that an invasion of privacy was done maliciously "within the legal definition of that term." A finding of actual malice as defined in *New York Times,* is not required only for punitive damages, but is necessary also to support an award of compensatory damages. Having correctly determined that there

was no evidence of known falsity or reckless disregard of the truth, the District Court should have granted the motion for a directed verdict as to all defendants.

There is an unavoidable conflict between the desire of most individuals for anonymity and privacy and the right of the people to enjoy a free flow of information guaranteed by the freedom of press provision of the First Amendment. There is no explicit guarantee of the right of privacy in the Constitution, nor was an action for its violation known at common law. The advent of this action has been traced by most commentators to an article, The Right of Privacy, by Warren and Brandeis which appeared in the Harvard Law Review in 1890 (41 Harv.L.Rev. 193). Though this article provides the rationale for recognition of the right, developments over the years have led to fundamental departures from the ideas expressed in it.

A legally protected right of privacy has been declared to exist in most American jurisdictions, including Ohio and West Virginia. See Prosser, Privacy, 48 Calif.L.Rev. 383. The Restatement of Torts also recognizes the concept:

The right of privacy is invaded when there is:

a) An unreasonable intrusion of one's seclusion, or

b) An appropriation of the other's name or likeness, or

c) Unreasonable publicity given to one's private life, or

d) "Publicity which unreasonably places the other in a false light before the public . . . ."

Restatement 2d, Torts, § 652A. Dean Prosser has written that the Restatement actually describes the invasion of four different interests and that four separate torts are included in the right of privacy, having in common an interference with the right "to be let alone." Prosser, op cit. at 389.

In dealing with privacy cases it is important that a court recognize and treat differently the various wrongs which

are included in the general concept of invasion of privacy. With reference to the classifications of the right of privacy set forth in the Restatement and Prosser, the action of the Cantrells was tried as one for publicity which unreasonably places a person in a false light before the public. Time, Inc. v. Hill, *supra,* was concerned with a New York statute which forbade the appropriation of a person's name or a likeness for profit. On appeal, it was presented as a "false light" case, since it was agreed that the right of the plaintiffs to recover depended on proof that the account of their experience was fictionalized. Since falsity was an element of the wrong, the Court applied the rule from New York Times v. Sullivan, *supra.* Since the present case was tried under the same theory as to the type of invasion of privacy complained of, we have sought to apply the rule of Time, Inc. v. Hill, *supra.*

While the Constitution does not explicitly guarantee the right of privacy, the Supreme Court has held that such a right does exist and is protected by various provisions of the Bill of Rights. See Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). When an invasion of privacy involves publication, the First Amendment must be considered and a mere balancing of rights will not suffice. If there are preferred positions among the rights guaranteed by the Bill of Rights, certainly such priority attaches to freedom of speech and the press rather than to the less explicit and less well defined right of privacy. See Lusky, Invasion of Privacy: A Clarification of Concepts, 72 Columbia L.Rev. 693. When the particular invasion of privacy complained of consists of publicity which places the plaintiff in a false light in the public eye, and the publication meets a reasonable standard of newsworthiness, then an action may be sustained only if actual malice as defined in New York Times v. Sullivan, *supra,* is established.

Our holding does not mean that a private citizen who involuntarily becomes newsworthy in the judgment of a publisher will forever remain a fair subject of publicity. In two cases decided forty years apart, Melvin v. Reid, 112 Cal.App. 285, 297 P. 91 (1931), and Briscoe v. Reader's Digest Association, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (1971), the Supreme Court of California dealt with situations where publications which were essentially truthful were held to constitute an invasion of privacy because the passage of time had rendered the subjects of the articles no longer newsworthy. In each case criminal activities which had occurred many years earlier were publicized and the person revealed to have committed them was at the time of the publication an accepted member of society who had made a clean break with the past. In *Briscoe* the California Court held that a person who was formerly in the news, after a period of time, was entitled to the "expectation of anonymity regained." 93 Cal.Rptr. 866, 483 P.2d at 41. These cases correctly establish a rule that there is no absolute immunity from damages for publishing truthful matters about essentially private persons long after their connection with newsworthy events has ceased to exist. This is particularly true when the matter made public is offensive according to the standards of reasonable men.

On the other hand, despite vigorous efforts to avoid publicity, some people remain newsworthy because of circumstances which arouse a legitimate interest in their lives. In Sidis v. F–R Publishing Corporation, 113 F.2d 806 (2d Cir. 1940), cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1941), this was held to be true in the case of a child prodigy who had made every effort for 25 years to avoid publicity and for whom the results of later publicity were disastrous. The judgment of what is newsworthy must remain primarily a function of the publisher. However, in cases where essentially private persons are the subject of publicity because of

their involuntary connection with events of widespread interest, this discretion or judgment of the publisher cannot be absolute. The curiosity and voracious appetite of the public for scandal would be too easily exploited by unscrupulous publishers. The right of the public to know is clearly one of the primary values protected by the First Amendment and its ". . . guarantees are not for the benefit of the press so much as for the benefit of all of us." Time, Inc. v. Hill, *supra*, 385 U.S. at 389, 87 S.Ct. at 543. No test has been authoritatively formulated (see Bloustein, Privacy, Tort Law and the Constitution, 46 Texas L. Rev. 611, 626 for a thoughtful suggestion) for judicial review of "newsworthiness" in these cases. Only in cases of flagrant breach of privacy which has not been waived or obvious exploitation of public curiosity where no legitimate public interest exists should a court substitute its judgment for that of the publisher. This is not such a case.

In Rosenbloom v. Metromedia, Justice Brennan writing for the Supreme Court stated the problem and the American answer to it as follows:

> We are aware that the press has, on occasion, grossly abused the freedom it is given by the Constitution. All must deplore such excesses. In an ideal world, the responsibility of the press would match the freedom and public trust given it. But from the earliest days of our history, this free society, dependent as it is for its survival upon a vigorous free press, has tolerated some abuse. In 1799, James Madison made the point in quoting (and adopting) John Marshall's answer to Talleyrand's complaints about American newspapers, American State Papers, 2 Foreign Relations 196 (U. S.Cong. 1832):
>
> > " 'Among those principles deemed sacred in America, among those sacred rights considered as forming the bulwark of their liberty, which the Government contemplates with awful reverence and would approach only with the most cautious circumspection, there is no one of which the importance is more deeply impressed on the public mind than the liberty of the press. That this *liberty* is often carried to excess; that it has sometimes degenerated into *licentiousness,* is seen and lamented, *but the remedy has not yet been discovered. Perhaps it is an evil inseparable from the good with which it is allied; perhaps it is a shoot which cannot be stripped from the stalk without wounding vitally the plant from which it is torn. However desirable those measures might be which might correct without enslaving the press, they have never yet been devised in America.' "* 6 Writings of James Madison, 1790–1802, p. 336 (G. Hunt ed. 1906) (emphasis in original). 403 U.S. at 51, 91 S.Ct. at 1823.

Although Mrs. Cantrell and her son were displeased with the article published by the Plain Dealer and the article was not as carefully written as it should have been, nevertheless there was no proof that the Forest City Publishing Company printed and distributed the article with any knowledge of the falsities contained in it or in reckless disregard of whether or not it was true. Absent a calculated falsehood, the publication or broadcast of material concerning an event of public interest may not result in the imposition of a judgment for damages because of falsehoods or distortions arising from negligence or poor reporting. The failure of the defendant Forest City Publishing Company to verify the factual assertions in the story is not condoned, but there was no evidence of calculated falsehood. See St. Amant v. Thompson, 390 U.S. 727, 733, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

The judgment of the District Court is reversed and the case remanded for entry of judgment for the defendants.