## CANTRELL ET AL. *v.* FOREST CITY PUBLISHING CO. ET AL.

No. 73–5520.  Argued November 13, 1974—
Decided December 18, 1974

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post,* p. 254.

*Harry Alan Sherman* argued the cause and filed briefs for petitioners.

*Smith Warder* argued the cause for respondents. With him on the brief were *John R. Coughlin* and *Mark L. Rosen.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Margaret Cantrell and four of her minor children brought this diversity action in a Federal District Court for invasion of privacy against the Forest City Publishing Co., publisher of a Cleveland newspaper, the Plain Dealer, and against Joseph Eszterhas, a reporter formerly employed by the Plain Dealer, and Richard Conway, a Plain Dealer photographer. The Cantrells alleged that an article published in the Plain Dealer Sunday Magazine unreasonably placed their family in a false light before the public through its many inaccuracies and untruths. The District Judge struck the claims relating to punitive damages as to all the plaintiffs and dismissed the actions of three of the Cantrell children in their entirety, but allowed the case to go to the jury

as to Mrs. Cantrell and her oldest son, William. The jury returned a verdict against all three of the respondents for compensatory money damages in favor of these two plaintiffs.

The Court of Appeals for the Sixth Circuit reversed, holding that, in the light of the First and Fourteenth Amendments, the District Judge should have granted the respondents' motion for a directed verdict as to all the Cantrells' claims. 484 F. 2d 150. We granted certiorari, 418 U. S. 909.

## I

In December 1967, Margaret Cantrell's husband Melvin was killed along with 43 other people when the Silver Bridge across the Ohio River at Point Pleasant, W. Va., collapsed. The respondent Eszterhas was assigned by the Plain Dealer to cover the story of the disaster. He wrote a "news feature" story focusing on the funeral of Melvin Cantrell and the impact of his death on the Cantrell family.

Five months later, after conferring with the Sunday Magazine editor of the Plain Dealer, Eszterhas and photographer Conway returned to the Point Pleasant area to write a follow-up feature. The two men went to the Cantrell residence, where Eszterhas talked with the children and Conway took 50 pictures. Mrs. Cantrell was not at home at any time during the 60 to 90 minutes that the men were at the Cantrell residence.

Eszterhas' story appeared as the lead feature in the August 4, 1968, edition of the Plain Dealer Sunday Magazine. The article stressed the family's abject poverty; the children's old, ill-fitting clothes and the deteriorating condition of their home were detailed in both the text and accompanying photographs. As he had done in his original, prize-winning article on the Silver Bridge disaster, Eszterhas used the Cantrell family to

illustrate the impact of the bridge collapse on the lives of the people in the Point Pleasant area.

It is conceded that the story contained a number of inaccuracies and false statements. Most conspicuously, although Mrs. Cantrell was not present at any time during the reporter's visit to her home, Eszterhas wrote, "Margaret Cantrell will talk neither about what happened nor about how they are doing. She wears the same mask of non-expression she wore at the funeral. She is a proud woman. Her world has changed. She says that after it happened, the people in town offered to help them out with money and they refused to take it." [1] Other significant misrepresentations were contained in details of Eszterhas' descriptions of the poverty in which the Cantrells were living and the dirty and dilapidated conditions of the Cantrell home.

The case went to the jury on a so-called "false light" theory of invasion of privacy. In essence, the theory of the case was that by publishing the false feature story about the Cantrells and thereby making them the objects of pity and ridicule, the respondents damaged Mrs. Cantrell and her son William by causing them to suffer outrage, mental distress, shame, and humiliation.[2]

---

[1] Eszterhas, Legacy of the Silver Bridge, the Plain Dealer Sunday Magazine, Aug. 4, 1968, p. 32, col. 1.

[2] Although this is a diversity action based on state tort law, there is remarkably little discussion of the relevant Ohio or West Virginia law by the District Court, the Court of Appeals, and counsel for the parties. It is clear, however, that both Ohio and West Virginia recognize a legally protected interest in privacy. *E. g., Housh* v. *Peth,* 165 Ohio St. 35, 133 N. E. 2d 340; *Roach* v. *Harper,* 143 W. Va. 869, 105 S. E. 2d 564; *Sutherland* v. *Kroger Co.,* 144 W. Va. 673, 110 S. E. 2d 716. Publicity that places the plaintiff in a false light in the public eye is generally recognized as one of the several distinct kinds of invasions actionable under the privacy rubric. See Prosser, Privacy, 48 Calif. L. Rev. 383, 398–401; Restatement (Second) of Torts § 652E (Tent. Draft No. 13).

## II

In *Time, Inc.* v. *Hill,* 385 U. S. 374, the Court considered a similar false-light, invasion-of-privacy action. The New York Court of Appeals had interpreted New York Civil Rights Law §§ 50–51 to give a "newsworthy person" a right of action when his or her name, picture or portrait was the subject of a "fictitious" report or article. Material and substantial falsification was the test for recovery. 385 U. S., at 384–386. Under this doctrine the New York courts awarded the plaintiff James Hill compensatory damages based on his complaint that Life Magazine had falsely reported that a new Broadway play portrayed the Hill family's experience in being held hostage by three escaped convicts. This Court, guided by its decision in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, which recognized constitutional limits on a State's power to award damages for libel in actions brought by public officials, held that the constitutional protections for speech and press precluded the application of the New York statute to allow recovery for "false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." 385 U. S., at 388. Although the jury could have reasonably concluded from the evidence in the *Hill* case that Life had engaged in knowing falsehood or had recklessly disregarded the truth in stating in the article that "the story re-enacted" the Hill family's experience, the Court concluded that the trial judge's instructions had not confined the jury to such a finding as a predicate for liability as required by the Constitution. *Id.,* at 394.

The District Judge in the case before us, in contrast to the trial judge in *Time, Inc.* v. *Hill,* did instruct the jury that liability could be imposed only if it concluded that the false statements in the Sunday Magazine feature

article on the Cantrells had been made with knowledge of their falsity or in reckless disregard of the truth.[3]  No objection was made by any of the parties to this knowing-or-reckless-falsehood instruction.  Consequently, this case presents no occasion to consider whether a State may constitutionally apply a more relaxed standard of liability for a publisher or broadcaster of false statements injurious to a private individual under a false-light theory of invasion of privacy, or whether the constitutional standard

---

[3] The District Judge instructed the jury in part:

"[T]he constitutional protection for speech and press preclude[s] redress for false reports of matters of public interest in the absence of proof that the defendants published the report with knowledge of its falsity or in reckless disregard of the truth.

.        .        .        .        .

"Thus, in this case the burden of proof is upon the plaintiffs to prove by a preponderance of the evidence their assertions of an invasion of privacy, the elements of which are:

"(1) An unwarranted and/or wrongful intrusion by the defendants into their private or personal affairs with which the public had no legitimate concern.

"(2) Publishing a report or article about plaintiff with knowledge of its falsity or in reckless disregard of the truth.

"(3) Defendants' acts of publishing a report or article about plaintiffs with knowledge of its falsity or in reckless disregard of the truth caused plaintiffs injury as individuals of ordinary sensibilities and damage in the form of outrage or mental suffering, shame or humiliation.

.        .        .        .        .

"Thus, if it be your conclusion and determination that plaintiffs have failed to prove by a preponderance of the evidence that defendants invaded the [plaintiffs'] privacy by publishing a report or article about them with knowledge of its falsity or in reckless disregard of the truth, you need not deliberate further and you will return a verdict in favor of the defendants."

The District Judge also charged the jury:

"An act is knowingly done if done voluntarily and intentionally and not because of mistake or accident or other innocent reason.

"Recklessness implies a higher degree of culpability than negligence. Recklessly means wantonly, with indifference to consequence."

announced in *Time, Inc.* v. *Hill* applies to all false-light cases. Cf. *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323. Rather, the sole question that we need decide is whether the Court of Appeals erred in setting aside the jury's verdict.

### III

At the close of the petitioners' case-in-chief, the District Judge struck the demand for punitive damages. He found that Mrs. Cantrell had failed to present any evidence to support the charges that the invasion of privacy "was done maliciously within the legal definition of that term." The Court of Appeals interpreted this finding to be a determination by the District Judge that there was no evidence of knowing falsity or reckless disregard of the truth introduced at the trial. Having made such a determination, the Court of Appeals held that the District Judge should have granted the motion for a directed verdict for respondents as to all the Cantrells' claims. 484 F. 2d, at 155.

The Court of Appeals appears to have assumed that the District Judge's finding of no malice "within the legal definition of that term" was a finding based on the definition of "actual malice" established by this Court in *New York Times Co.* v. *Sullivan*, 376 U. S., at 280: "with knowledge that [a defamatory statement] was false or with reckless disregard of whether it was false or not." As so defined, of course, "actual malice" is a term of art, created to provide a convenient shorthand expression for the standard of liability that must be established before a State may constitutionally permit public officials to recover for libel in actions brought against publishers.[4] As

---

[4] In *Time, Inc.* v. *Hill*, 385 U. S. 374, the Court did not employ this term of art. Instead, the Court repeated the actual standard of knowing or reckless falsehood at every relevant point. See, *e. g.*, *id.*, at 388, 390, 394.

such, it is quite different from the common-law standard of "malice" generally required under state tort law to support an award of punitive damages. In a false-light case, common-law malice—frequently expressed in terms of either personal ill will toward the plaintiff or reckless or wanton disregard of the plaintiff's rights—would focus on the defendant's attitude toward the plaintiff's privacy, not toward the truth or falsity of the material published. See *Time, Inc.* v. *Hill,* 385 U. S., at 396 n. 12. See generally W. Prosser, Law of Torts 9–10 (4th ed.).

Although the verbal record of the District Court proceedings is not entirely unambiguous, the conclusion is inescapable that the District Judge was referring to the common-law standard of malice rather than to the *New York Times* "actual malice" standard when he dismissed the punitive damages claims. For at the same time that he dismissed the demands for punitive damages, the District Judge refused to grant the respondents' motion for directed verdicts as to Mrs. Cantrell's and William's claims for compensatory damages. And, as his instructions to the jury made clear, the District Judge was fully aware that the *Time, Inc.* v. *Hill* meaning of the *New York Times* "actual malice" standard had to be satisfied for the Cantrells to recover actual damages. Thus, the only way to harmonize these two virtually simultaneous rulings by the District Judge is to conclude, contrary to the decision of the Court of Appeals, that in dismissing the punitive damages claims he was not determining that Mrs. Cantrell had failed to introduce any evidence of knowing falsity or reckless disregard of the truth. This conclusion is further fortified by the District Judge's subsequent denial of the respondents' motion for judgment *n. o. v.* and alternative motion for a new trial.

Moreover, the District Judge was clearly correct in believing that the evidence introduced at trial was sufficient

to support a jury finding that the respondents Joseph Eszterhas and Forest City Publishing Co. had published knowing or reckless falsehoods about the Cantrells.[5] There was no dispute during the trial that Eszterhas, who did not testify, must have known that a number of the statements in the feature story were untrue. In particular, his article plainly implied that Mrs. Cantrell had been present during his visit to her home and that Eszterhas had observed her "wear[ing] the same mask of non-expression she wore [at her husband's] funeral." These were "calculated falsehoods," and the jury was plainly justified in finding that Eszterhas had portrayed the Cantrells in a false light through knowing or reckless untruth.

The Court of Appeals concluded that there was no evidence that Forest City Publishing Co. had knowledge of any of the inaccuracies contained in Eszterhas' article. However, there was sufficient evidence for the jury to find that Eszterhas' writing of the feature was within the scope of his employment at the Plain Dealer and that Forest City Publishing Co. was therefore liable under traditional doctrines of *respondeat superior.*[6] Although Eszterhas was not regu-

---

[5] Although we conclude that the jury verdicts should have been sustained as to Eszterhas and Forest City Publishing Co., we agree with the Court of Appeals' conclusion that there was insufficient evidence to support the jury's verdict against the photographer Conway. Conway testified that the photographs he took were fair and accurate depictions of the people and scenes he found at the Cantrell residence. This testimony was not contradicted by any other evidence introduced at the trial. Nor was there any evidence that Conway was in any way responsible for the inaccuracies and misstatements contained in the text of the article written by Eszterhas. In short, Conway simply was not shown to have participated in portraying the Cantrells in a false light.

[6] The District Judge instructed the jury:

"Any act of an employee or agent, to become the act of the corpora-

larly assigned by the Plain Dealer to write for the Sunday Magazine, the editor of the magazine testified that as a staff writer for the Plain Dealer Eszterhas frequently suggested stories he would like to write for the magazine. When Eszterhas suggested the follow-up article on the Silver Bridge disaster, the editor approved the idea and told Eszterhas the magazine would publish the feature if it was good. From this evidence, the jury could reasonably conclude that Forest City Publishing Co., publisher of the Plain Dealer, should be held vicariously liable for the damage caused by the knowing falsehoods contained in Eszterhas' story.

For the foregoing reasons, the judgment of the Court of Appeals is reversed and the case is remanded to that court with directions to enter a judgment affirming the judgment of the District Court as to the respondents Forest City Publishing Co. and Joseph Eszterhas.

*It is so ordered.*

Mr. Justice Douglas, dissenting.

I adhere to the views which I expressed in *Time, Inc.* v. *Hill,* 385 U. S. 374, 401–402 (1967), and to those of Mr. Justice Black in which I concurred, *id.,* at 398–401. Freedom of the press is "abridged" in violation of the First

---

tion, must be performed by the employee while acting within the scope of his employment.

.          .          .          .          .

"The Court charges you as a matter of law that before any acts or knowledge of Joseph Eszterhas or Richard T. Conway may be imputed to the defendant, Forest City Publishing Company, the plaintiffs must prove by a preponderance of the evidence that defendant, Forest City Publishing Company, had actual knowledge of those acts and information or that Conway and Eszterhas were acting within the scope of their employment when they performed the acts or acquired the information."

None of the parties objected to this instruction.

and Fourteenth Amendments by what we do today. This line of cases, which of course includes *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), seems to me to place First Amendment rights of the press at a midway point similar to what our ill-fated *Betts* v. *Brady,* 316 U. S. 455 (1942), did to the right to counsel. The press will be "free" in the First Amendment sense when the judge-made qualifications of that freedom are withdrawn and the substance of the First Amendment restored to what I believe was the purpose of its enactment.

A bridge accident catapulted the Cantrells into the public eye and their disaster became newsworthy. To make the First Amendment freedom to report the news turn on subtle differences between common-law malice and actual malice is to stand the Amendment on its head. Those who write the current news seldom have the objective, dispassionate point of view—or the time—of scientific analysts. They deal in fast-moving events and the need for "spot" reporting. The jury under today's formula sits as a censor with broad powers—not to impose a prior restraint, but to lay heavy damages on the press. The press is "free" only if the jury is sufficiently disenchanted with the Cantrells to let the press be free of this damages claim. That regime is thought by some to be a way of supervising the press which is better than not supervising it at all. But the installation of the Court's regime would require a constitutional amendment. Whatever might be the ultimate reach of the doctrine Mr. Justice Black and I have embraced, it seems clear that in matters of public import such as the present news reporting, there must be freedom from damages lest the press be frightened into playing a more ignoble role than the Framers visualized.

I would affirm the judgment of the Court of Appeals.