327 So.2d 810 (1976)
GREEN VALLEY SCHOOL, INC., a Florida Corporation, Not for Profit, Appellant,
v.
COWLES FLORIDA BROADCASTING, INC., a Florida Corporation, Owner and Operator of Wesh-Tv-Channel Two, et al., Appellees.
No. X-24.
District Court of Appeal of Florida, First District.
February 18, 1976.
Rehearing Denied March 26, 1976.
Craig T. James of Clayton & James, Deland, for appellant.
P.S. Paul and Sanford L. Bohrer of Paul & Thompson, Miami, for appellees.
RAWLS, Acting Chief Judge.
On February 10, 1973, at 6:00 p.m.,[1] appellees Todd and Rozier, employees of appellee Cowles Florida Broadcasting, Inc., published the following narration on *811 WESH-TV, Channel 2 (television station owned by appellee Cowles):
"FRED BREWSTER [newscaster]: The President of a controversial private school in West Volusia County was arrested last night along with three staff members as a platoon of law enforcement officers raided the facility. The President was charged with `False Imprisonment' and the staffers held on narcotics charges. Channel 2's Dean Todd was there and files this report:
"DEAN TODD: No less than 50 law enforcement officers from all departments in Volusia County except DeLand and the Sheriff's Office gathered last night in DeLand under the leadership of Chief Investigator Jack Lynady of the State Attorney's Office. They were about to swoop down on the controversial Green Valley School in Orange City after over two years of investigation they planned to arrest Ronald Nowicki, Headmaster and President. Charge: `False Imprisonment'
"The Law Department sprang after a Phys. Ed. Instructor, identified only as a Mr. Kelley, told police it was common practice to lock up the students for days, even weeks at a time. But there was even more. There were allegations of rampant sexual conduct between students themselves and between staff members and female students.
"Nowicki was rousted out of his bed at his small, untidy apartment in a building known as the Monastery. With him was a young, female staff member  he told investigators they were on night duty together.
"About 65 students live on the campus and while Nowicki was being advised of his rights the other officers began securing the other buildings in military fashion. According to officers, some of the male and female students were living in the same dormitories. Most of the rooms were in apparently permanent shambles. The rooms were filthy, even those of most of the staff members were in complete disarray.
"It wasn't long before officers began turning up drugs by the armload. Many were vitamins, many were prescription drugs which have not been identified by the searchers.
"Something else was turned up during the searches: These are electric shock collars. They are made for dog training, but here, according to some of the students, they are used on them, occasionally. Also turned up were a set of shackles and handcuffs used to bind the children. Apparently such implements were expected to be found by the raiders.
"This is 15 year old Mitchell Spalding of San Diego, California, on the right; 14 year old Marc Corren of Miami Beach. The State of California pays $16,000.00 a year for Spalding to stay here. The filth is astounding. Spalding and Corren both told Channel 2 News they had electric cattle prods used on them by staff members and that it was common.
"DEAN TODD: Did they use a cattle prod on you?
"MITCHELL SPALDING: Um, yea, they used it once on me.
"DEAN TODD: For what?
"MITCHELL SPALDING: For nothing. I was asleep and they came up drunk and
"DEAN TODD: Who did?
"MARC CORREN: Me.
"MITCHELL SPALDING: Ah ...
"MARC CORREN: Staff, staff members man.
"MITCHELL SPALDING: Ah, it was Mike Hannigan and I, I was asleep at the time and so I don't know who else *812 did it. But they come up with this bull shocker, ya see, ya know, they really bull shocked me but I hadn't done anything.
"MARC CORREN: I mean that is enough to drive a cow sick man, it could even hurt you, you can feel pain for the next four days.
"DEAN TODD: This is the block house, inside it is bare. Students are reportedly locked inside for days. Eighteen year old Sue Borman of Levitt Town, Pennsylvania, told us that she had been locked in there once, for a week.
"Simultaneously, a Marina, owned by the Green Valley School also was raided. Some six of the students were found when law enforcement officers came upon the area West of DeLand, a short distance South of the Hontoon Marina. The main object of the search was an old boat, a World War II mine-sweeper converted into a diving rig called the `FEARLESS' and reportedly housed students in certain detention cells. But the `FEARLESS' apparently has not left its birth [sic] for two years. It has, aboard it, a decompression chamber. It is supposed to be used primarily by divers stuck with the bends or nitrogen narcosis.
"Informed sources told us that students had been locked in here, as punishment. A brig, located in the bow of the ship, was filthy and rat infested, students reportedly were housed in here, human excrement was also found in this area.
"Back at the school, officers continued to find more pills, some in the room of an instructor. A collection of color slides which graphically detailed several nude women was found in the therapy room as well as a host of electric instruments.
"The searches continued until dawn. Investigator, Lynady summed up the arrest that had been made then:
"JACK LYNADY: A man was arrested for `False Imprisonment', another man was arrested for possession of, ah, marijuana, and ah drug paraphernalia, two girls were arrested for ah ...
"DEAN TODD: It may be sometime before the full implications of last nights raid are known.
"The Federal Government reportedly pays the School about $600,000.00 a year, various states and private individuals pay `exorbitant' amounts to house delinquent children and some with medical problems here.
"The apparent owner, George von Hilshmier, was in Canada. He apparently runs one or two other similar schools; one located in New York.
"Accompanying the officers last night were Internal Revenue Agents who confiscated the School's financial records.
"Some of the children reacted to the raid with fear, some with surprise or amusement. They may have a lot to tell later.
"This investigation, which began two years ago, may be just beginning.
"Dean Todd, Channel 2 News, Orange City.
"FRED BREWSTER: State Attorney, Steven Boyles, said the School could be closed as a public nuisance. Boyles told Channel 2 Green Valley is chartered by the Circuit Court under a State Statute on private schools, and that a ruling as to the application of the law as it relates to the Green Valley School might be obtained from the Attorney General.
"Further charges may be filed pending the outcome of the lab tests of the various drugs taken last night."
As a result of the foregoing, Green Valley filed its complaint sounding in libel and slander and malicious trespass. Extensive discovery was had together with numerous hearings, resulting in a large pasteboard box of records numbering some 22 volumes and more than 3,000 pages. The trial *813 court entered summary judgment in favor of appellees; hence this appeal.
Two points are posed for our consideration, viz: 1) The record shows substantial issues of material fact, and 2) The trial court erred in denying appellant's Motion and Application for Disqualification.
Additional facts are material. Prior to the above mentioned raid, Jack Lynady, Chief Investigator for the state attorney's office of the Seventh Judicial Circuit, procured a search warrant commanding:
"... ALL AND SINGULAR THE SHERIFF AND/OR DEPUTY SHERIFFS OF VOLUSIA COUNTY, FLORIDA, OR INVESTIGATORS FOR THE STATE ATTORNEY'S OFFICE, SEVENTH JUDICIAL CIRCUIT, STATE OF FLORIDA [to search]:
"... Those lands described in deed of record in Official Records Book 1196, page 629 of the Public Records of Volusia County, Florida,[2] believed to be the property owned by Green Valley School, Inc., is being used as a means to commit the felony offenses of false imprisonment, child abuse, and lewd and lascivious behavior... ."
The warrant further authorized the search to be conducted either in the daytime or nighttime. Lynady arranged a raiding party of some fifty policemen from several municipalities within Volusia County and employees of the state attorney, who were designated "special investigators" by the state attorney.[3] Lynady also invited appellees Rozier and Todd and other news media personnel to participate in the midnight raid. The party was briefed by Lynady during the evening of February 9, 1973, and at approximately 11:30 p.m. the search party, accompanied by Rozier and Todd (and other news media personnel), arrived upon the premises of Green Valley. Excerpts from various affidavits and depositions regarding the raid reveal the following:
Edward Brenner  Teacher and Counsellor
"4. At about midnight or sometime thereafter, I was awakened by several beefy, ununiformed men who claimed that they were policemen and who ordered me to remain just outside my room. These individuals refused to produce identification, displayed no badges, and would not produce a warrant. I asked them by what authority they were there and they refused to tell me anything more than `this is a raid, and we are going to get the goods on you.'
......
"6. These obese persons began abusing the children in my care with verbal threats and by telling them to `tell everything you know and it will go easy on you kid'. They asked each child many leading questions. Two of the children, both of whom were obviously highly agitated, and both were known to me to be highly disturbed children began to answer questions about abuse and illegalities in a positive manner. They were then stopped by the cigar smoking fat man questioning them who shouted to others to `call the TV camera, get Todd over here'.
"7. A white station wagon clearly marked as belonging to Channel Two then arrived and another plump man and a TV camera man with several other individuals got out. They then filmed Mitchel Spaulding, a boy then just a few months out of a mental hospital and now again in a state mental hospital, who was *814 to my eyes and who appears to me on the TV program filmed by Channel Two, to be highly disturbed and agitated. They also filmed Michael Corren, a boy with a long delinquent history who also was very obviously under great mental strain.
"8. The cigar smoking person who claimed he was a policeman took the lead in telling the boys what to say. In no way did the transaction resemble a questioning. The boys were told what to say and parrotted it. This was obvious to the plump person from Channel Two who seemed to be the announcer and who subsequently has been identified to me on the TV program as Dean Todd. It was also obvious to the individual accompanying him.
......
"Any dirt, filth, pictures, or other disarray and mess was caused primarily by the first group of overweight cigar smoking men who called themselves police. These men pointedly and particularly arranged furniture, sheets, trash, and vitamin pills in groups for the TV camera men. This was done in the full view of the second group of men, including Dean Todd, the plump man who seemed to be the leader of the group emerging from the white station wagon."
Susan Borman  Student
"7. I love Green Valley School and I saw the television program on WESH-TV and it was just one lie after another. It was especially a lie when it said I said I had been locked up for weeks in the Bomb Shelter. I did not say it, I only kept telling them to leave me alone and that I did not want to get into trouble... . I was afraid of what they would do to me especially after they [sic] way they tore up my room. I did not know what my rights were and they just came into my room like burglars and scared me to death and then told me I could go to jail after they tore my room all apart and made it a terrible mess. Every where you could see them tearing up rooms like animals."
Faye Brown  Staff Member of Green Valley
"4. At 1:45 a.m. a group of roughly dressed men entered the Medical Center and announced that they were searching the entire building and campus.
......
"7. The WESH-TV Channel Two Team appeared at the Medical Center shortly after the men arrived and were told by one of them, `We aren't ready for you yet, come back later.' They entered the building without knocking and were not invited to come in."
Wendy Clark  Teacher
"2. I was awake when a group of men, who refused to identify themselves to me, swarmed into the Quads and made all the children leave their rooms and stand in front of them. They would not identify themselves to me, they showed me no warrant or any other piece of paper. They were dressed more or less like hunters and their mood and actions were like that of a group of college boys at a `panty raid.' The only indication that they were policemen, was that they told me I would be arrested if I moved from in front of my room.
"3. I found the experience terrifying and so did the children in my charge. Several of the girls were jerred [sic] at and their inadequate clothing pointed at repeatedly by the strangers and especially the men from the station wagon from WESH-TV... . Their behavior was like that of nasty boys while crashing a girl's picnic when the adults are away."
Harry Detweiler  Public School Teacher from Ashland, Oregon  Volunteer in order to learn about successful methods of working with very disruptive children.

*815 "2. Sometime after midnight on February 9th [February 10], 1973, I was awakened by a great deal of racket in the Administration Building where I occupied the single bedroom upstairs. By the time I came down the stairs there were more than twenty people in the building.
"3. The men had obviously gotten in by breaking a door and one of the men had cut himself pretty badly. No one would give me a warrant or any identification although they asked for my identification.
"4. There are several thousand slides in one of the three treatment rooms upstairs. The men were going through the slides with a great air of comedy. The majority of the slides have to do with innocuous subjects and are used to treat phobias by the psychiatrists or their aides here. A few of the trays deal with nude human figures and these were greeted with great enthusiasm by the men, and especially those whom it was easy to identify as newsmen and the men from WESH-TV Channel Two.
......
"6. WESH-TV and the still photographers spent a great deal of film on a large plastic bag full of comfrey tea (an old fashioned herbal tea). It was clearly labeled and to the eye does not look anything like parsley, oregano or the marijuana identification kits they give out to school teachers. The newsmen were totally uninterested in my statements that it was unfair to take pictures of herb tea and call it drugs. In the WESH-TV program I saw that the bag of tea was shown while Dean Todd talked about `armloads of drugs.'"
Carole Rice  Student at Green Valley for several years
"3. My girlfriend, Cathy Hynds, had been in bed dressed in a man's tee shirt. It was barely long enough to cover her legs. The police would not let her get dressed.
"4. The station wagon came over and the camera man took pictures of my room. The room looked awful, but I always have a clean room and it was only because the cops had torn it up.
"5. While the man who is called Dean Todd on the TV was standing by my room, he kept pointing at Cathy Hynds and laughing and joking and being awful. I was so mad that I cried. Poor Cathy was humiliated. When I saw that fat face again at a press conference I was so mad I had to leave. He acted like a bully that night. All of those men were joking and laughing and making nasty remarks. They must think we are stupid because one would be sticky sweet and say he was helping us and another would be nasty and say `tell us where your drugs are,' `do you take them in your arm,' `where's your needles?' They kept it up for hours.
......
"7. I saw the TV broadcast that Dean Todd did and he is just a liar. He helped those cops mess up things, and he only took pictures after the cops called him over with some special goodie they had made up. He was ugly and obscene to the girls and made Cathy especially humiliated."
Martin Hoade  Counsellor at Green Valley for four years
"14. I am also familiar with the ship, the `Fearless,' and have been entirely through the ship on many occasions. I have at no time seen any evidence of rats. The ship has never been used for feeding, even during its career in the U.S. Navy, and the permeation of the ship with diesel fuel during the period in which the Navy was not using it, it was docked at Washington, D.C. There is no brig on the ship. The ship was delivered to the School in March, 1972, contrary *816 to the news report of WESH-TV. At no time during that eleven months have I seen the ship or its quarters to be filthy, no child has been locked in any portion of the ship, and most particularly has no child been locked in the recompression chamber. I have had free access to the ship and the nature of my duties make it necessary for me to go onto the ship at irregular intervals. It is physically impossible to lock the recompression chamber from the outside, and
Peggy Milner
"1. My name is Peggy Milner and I am presently a teacher at the Glaydin School in Leesburg, Virginia, and I was for three years a Teacher, for two years Dean of Women, and for one half a year Academic Dean at Green Valley School.
......
"19. I have seen the tape of the broadcast made by WESH-TV purporting to be news of the raid. It is utterly unfair and distorted.
......
"24. The TV crew from WESH-TV had complete access to the Campus. They focused on two areas, the Boy's Dome, in which six children lived and the Quadrangles, in which about ten children lived. They did not enter any area until it had been thoroughly disrupted by police and mud dragged in on belongings scattered on the floor. They saw no evidence of sexual misconduct, they saw no evidence of sexual misconduct between staff and children. They observed areas in which less than ten of a Staff of more than forty lived and deliberately lied about the condition of both Staff and children and their quarters."
Ronald E. Nowicki, headmaster and teacher at Green Valley for seven years, testified on deposition:
"Furthermore I called Channel Two after the six o'clock news and I stated that I considered the six o'clock news to be mostly false and malicious and if they repeated it at eleven o'clock we would file a suit, and it was repeated in toto at eleven o'clock.
......
"A. I told him that the rooms were a mess after the raiders had looked through them, not before that. And that I was not rousted from my bed, that I was in fact on duty that night and cooking in the kitchen.
"Q. Now, other than these two facts which you have stated, do you have any other facts or any other evidence which would support your contention that the newscasts were specifically designed and prepared to defame, slander and libel Green Valley School?
"A. Yes, the newscasts said that IRS men participated in the raid and seized financial files.
"Q. Anything else?
"A. Some statement to the effect that the beverage control people were there, but I have no knowledge of that either.
"Q. Do you have any knowledge that Channel Two was not in fact told that IRS men would participate?
"A. They didn't state that in their broadcast. They didn't say that they had been told, they said IRS men was [sic] there and seized financial files."
This record further reflects other evidence to impeach the statements: "after over two years of investigation they planned to arrest Ronald Nowicki, Headmaster and President", "rampant sexual misconduct", "rooms were filthy", "drugs by the armload", and other items reported as eyewitness news. The record clearly reflects extensive communication between appellee Cowles' employees and the state attorney's *817 office immediately prior to the raid.
Appellees, in their excellent brief and appendix, first contend that appellant cannot recover for libel because the allegedly false statements are true in every respect. They then set forth excerpts of the allegedly false statements and compare each, primarily, with an article prepared by one Robert Sherrill which was attached to an affidavit executed by him.[4] In his affidavit, Mr. Sherrill stated that he had prepared an article on Green Valley School which was submitted to Mr. Paul, attorney for the Miami Herald. The affidavit further stated that as an experienced reporter:
"... I would expect any reporter worth paying a salary, to examine search warrants and their supporting documents and to put very hard questions to policemen before and after accompanying policemen on any action which involved a search warrant and the invasion of the privacy of homes.
"8. As an experienced reporter I know that police raids involving fifty or more raiders are very unusual. If I were invited to go on such a raid I would be more than exceptionally careful to examine all documents involved, to research the background of the raid, and I would be inclined to regard information from the police as insufficient and probably misleading.
......
"11. I have read a transcript of an WESH-TV broadcast alleged to describe conditions at the school... . So far as I can see, the report had no purpose other than to try to excuse a raid that was inexcusable and probably illegal."
The article attached to the foregoing affidavit was not sworn to and, when read in conjunction with the affidavit, clearly was not intended to be considered as sworn testimony. By extracting excerpts of the article and excerpts from the affidavit of Lynady, appellees contend that as a matter of law the alleged false statements are true in all material respects.
It is elementary that a summary judgment should be sparingly granted so as not to infringe on the constitutional right to a jury trial;[5] that a summary judgment is not a substitute for trial[6] and should not be granted unless the facts are so crystallized that nothing remains but questions of law.[7]
Appellees urge by their brief that:
"As Appellant admits in its brief, to recover against Appellees for libel Appellant as a public figure must satisfy the New York Times standard ... that is it `may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.'"[8]
*818 Appellees then quote this court's statement in Damron v. Ocala Star-Banner Company,[9] viz:
"Apparently, the Federal Supreme Court has ruled that a public figure is without recourse when the news media, without proof of `express malice' of `convincing clarity' chooses to publish defamatory falsehoods about such public figure. Thus, we are compelled to affirm the [summary judgment for the defendant]... ."
and conclude that there is not a shred of evidence in this record to support any theory of express or actual malice.
Gertz v. Welch,[10] in which the United States Supreme Court re-examined the "New York Times" doctrine, left dangling in the air on a case-by-case basis the question of what constitutes a "public figure". A reading of Gertz discloses an apparent re-evaluation by that court of its prior immunization of the press from libel actions.
New York Times Co. v. Sullivan and later cases explicating the doctrine there expressed have been the subject of innumerable appellate decisions, law review articles, and scholarly treatises. The continuous dichotomy created by the need to protect "freedom of press" while preserving "the rights of private individuals and public figures" has to a great extent been resolved by the United States Supreme Court in Cantrell v. Forest City Pub. Co.,[11] with only one dissenting opinion. There, Mrs. Cantrell and her son survived a motion for directed verdict, and a judgment in their favor was entered upon a jury verdict. Upon appeal the Sixth Circuit Court of Appeals reversed, holding that the trial judge should have granted defendant's motion for a directed verdict.[12] The United States Supreme Court reversed the Sixth Circuit and directed that the judgment be affirmed as to Forest City Publishing Company and its employee (reporter), Joseph Eszterhas. In so doing, the Supreme Court once again examined New York Times Co. v. Sullivan, supra, and Time, Inc. v. Hill.[13] Of interest here is that the trial judge instructed the jury that liability could be imposed only if it concludes that the false statements in the Sunday Magazine feature article on the Cantrells had been made with "knowledge of its falsity or in reckless disregard of the truth."[14] In commenting upon the opinion of the appellate court, the Supreme Court stated:
"The Court of Appeals appears to have assumed that the District Judge's finding of no malice `within the legal definition of that term' was a finding based on the definition of `actual malice' established by this Court in New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 95 A.L.R.2d 1412: `with knowledge that [a defamatory statement] was false or with reckless disregard of whether it was false or not.' As so defined, of course, `actual malice' is a term of art, created to provide a *819 convenient shorthand for the standard of liability that must be established before a State may constitutionally permit public officials to recover for libel in actions brought against publishers. As such, it is quite different from the common-law standard of `malice' generally required under state tort law to support an award of punitive damages. In a false-light case, common-law malice  frequently expressed in terms of either personal ill will toward the plaintiff or reckless or wanton disregard of the plaintiff's rights  would focus on the defendant's attitude toward the plaintiff's privacy, not towards the truth or falsity of the material published. See Time, Inc. v. Hill, 385 U.S. at 396 n. 12, 87 S.Ct. 534, at 546 n. 12, 17 L.Ed.2d 456. See generally W. Prosser, Law of Torts 9-10 (4th ed.)."
Thus, it is "mica" clear that in weighing the facts of this summary judgment proceeding upon the scales of Cantrell, supra, the instant summary judgment discharging appellees from liability as a matter of law must be reversed.
To uphold appellees' assertion that their entry upon appellant's property at the time, manner, and circumstances as reflected by this record was as a matter of law sanctioned by "the request of and with the consent of the State Attorney" and within the "common usage and custom in Florida" could well bring to the citizenry of this state the hobnail boots of a nazi stormtrooper equipped with glaring lights invading a couple's bedroom at midnight with the wife hovering in her nightgown in an attempt to shield herself from the scanning TV camera. In this jurisdiction, a law enforcement officer is not as a matter of law endowed with the right or authority to invite people of his choosing to invade private property and participate in a midnight raid of the premises.[15]
Finally, we reach the question of the refusal of the trial judge to disqualify himself from further participation in these proceedings. Numerous depositions in the discovery proceedings were taken in open court under the auspices of the trial judge. Appellant sought disqualification of the trial judge by filing motions with affidavits attached. The motions and supporting affidavits do not as a matter of law require a reversal by this court of the judge's order denying same. However, the record as a whole supports appellant's contention that: "... Plaintiff fears it will not receive a fair trial in the Court where the above suit is pending... ." As was stated by this court in State ex rel. Arnold v. Revels:[16]
"We know of nothing more vital in the administration of justice in America than that the judge who sits in judgment on the life, liberty, or property of persons before his court be perfectly impartial. We think it a judge's duty not only to harbor no prejudice toward such persons but also to avoid the appearance of such prejudice."
In the present proceedings it may well be that, if we were able to look into the mind of the trial judge, we would find no actual prejudice toward appellant. However, this record reflects a number of instances (which will not be detailed) in which the trial judge failed to avoid the appearance of bias or prejudice towards appellant. In consideration of "the totality of the circumstances"[17] present in this case, upon remand, we direct the Chief Judge to assign another judge to preside over further proceedings.
Reversed and remanded with directions.
SMITH and MILLS, JJ., concur.
NOTES
[1] Approximately the same version of this broadcast was presented on Channel 2 News at 11:00 p.m. the same night.
[2] Appellant contends that the search warrant is deficient in that it fails to describe with particularity the premises to be searched and, further, that the record referred to described at most 25 percent of the premises searched by the raiding party.
[3] Mrs. Emmett Rozier, Lynady's personal secretary and the wife of appellee Rozier, was designated as a member of the search party.
[4] Robert Sherrill deposed that for the last 26 years he has written for newspapers and magazines. Among his employers have been Time, Life, Harper's, Esquire, the New York Times Magazine, and The Miami Herald.
[5] Murrell v. Vick, 178 So.2d 133 (2 Fla.App. 1965).
[6] Richmond v. Florida Power & Light Co., 58 So.2d 687 (Fla. 1952).
[7] Shaffran v. Holness, 93 So.2d 94 (Fla. 1957).
[8] New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the U.S. Supreme Court equated reckless disregard for the truth with subjective awareness of probable falsity: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."
[9] Damron v. Ocala Star-Banner Company, 263 So.2d 291 (1 Fla.App. 1972).
[10] Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
[11] Cantrell v. Forest City Pub. Co., 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974).
[12] Cantrell v. Forest City Pub. Co., 484 F.2d 150 (6th Cir.1973).
[13] Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).
[14] The Supreme Court, in commenting upon the evidence, stated: "There was no dispute during the trial that Eszterhas, who did not testify, must have known that a number of the statements in the feature story were untrue. In particular, his article plainly implied that Mrs. Cantrell had been present during his visit to her home and that Eszterhas had observed her `wear[ing] the same mask of nonexpression she wore [at her husband's] funeral.' These were `calculated falsehoods,' and the jury was plainly justified in finding that Eszterhas had portrayed the Cantrells in a false light through knowing or reckless untruth."
[15] Fletcher v. Florida Publishing Company, 319 So.2d 100 (1 Fla.App. 1975).
[16] State ex rel. Arnold v. Revels, 113 So.2d 218 (1 Fla.App. 1959).
[17] Department of Revenue v. Golder, 322 So.2d 1 (Fla. 1975).