NO. 07-02-0450-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



JUNE 16, 2003


______________________________



CHRISTOPHER ANTHONY MORALES
,




 Appellant


v.



THE STATE OF TEXAS, 




 Appellee

_________________________________



FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;



NO. 42660-D; HON. DON EMERSON, PRESIDING


_______________________________



Before QUINN and REAVIS, JJ., and BOYD, SJ. (1)

 Appellant Christopher Anthony Morales appeals from an order adjudicating him
guilty of the offense of unauthorized use of a motor vehicle. Pursuant to a plea agreement,
appellant pled guilty to the offense on August 15, 2000, and the trial court deferred the
adjudication of his guilt and placed him on community supervision for five years. 
Subsequently, the State filed a motion to proceed with the adjudication of his guilt. 
Appellant pled true to the alleged violations of the terms of his community supervision,
and the trial court continued his community supervision with additional conditions imposed. 
Later, the State filed another motion to proceed with the adjudication of his guilt. Once
again, appellant pled true to the alleged violations on October 1, 2002, and the court
adjudicated his guilt and sentenced him to two years in a state jail facility. The trial court
granted appellant permission to appeal on January 27, 2003. 

 Appellant's counsel has now moved to withdraw, after filing a brief pursuant to
Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and
representing that she has searched the record and found no arguable grounds for
reversal. The motion and brief illustrate that appellant was informed of his right to review
the appellate record and file his own brief. So too did we inform appellant that any pro se
response or brief he cared to file had to be filed by June 11, 2003. To date, appellant has
filed no pro se response or brief. 

 In compliance with the principles enunciated in Anders, appellate counsel discussed
three potential areas for appeal. First, counsel explained that appellant failed to appeal
issues related to his original plea of guilt within 30 days of being placed on deferred
adjudication and that article 42.12 of the Code of Criminal Procedure provides that no
appeal may be taken from a determination to proceed with adjudication of guilt. Further,
nothing in the record indicates the judgment is void. Second, counsel points out that a
defendant may not raise the issue of the voluntariness of his plea at the time of
adjudication, and the record contains prima facie evidence the plea was knowing and
voluntary. Finally, the record does not contain any explanation as to trial counsel's actions
so as to provide a basis for an ineffective assistance of counsel claim. 

 We have also conducted an independent review of the record to determine whether
there existed reversible error and found none. Stafford v. State, 813 S.W.2d 503, 511
(Tex. Crim. App. 1991) (requiring us to conduct an independent review). The record
illustrates that no appeal was taken within 30 days from the date of appellant's guilty plea
and the order to defer adjudication of his guilt. When the adjudication of an accused's guilt
is deferred and the individual is placed on community supervision, complaints involving the
original plea proceeding must be raised on appeal immediately after deferred adjudication
is imposed. Nix v. State, 65 S.W.3d 664, 667 (Tex. Crim. App. 2001); Manuel v. State, 994
S.W.2d 658, 661-62 (Tex. Crim. App. 1999). The only instance in which they may
thereafter be raised by direct appeal concerns error rendering the judgment void, Nix v.
State, 65 S.W.3d at 667-68, of which there is no evidence in the record. Thus, we have
no jurisdiction over any purported error arising from or prior to the plea hearing. Further,
appellant pled true to the violations of his community supervision, and no appeal may be
taken from a determination to proceed with adjudication of guilt. Tex. Code Crim. Proc.
Ann. art. 41.12 §5(b) (Vernon Supp. 2003). The punishment assessed was also within the
range prescribed by law. Tex. Pen. Code Ann. §12.35(a) (Vernon 2003).

 Accordingly, we grant counsel's motion to withdraw and affirm the judgment of the
trial court.


 Brian Quinn

 Justice


Do not publish.
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't
Code Ann. §75.002(a)(1) (Vernon Supp. 2003). 



ain language.” Stringer v. Cendant Mortgage Corp., 23 S.W.3d\
353, 355 (Tex. 2000); Republican Party of Tex. v. Dietz, 940 S.W.2d 86, 89 (Tex. 1997). \
Clark contends the three words–“or other purposes”–somehow expands the Petition\
Clause to protect statements by petitioners with an “absolute privilege.” However, we\
interpret these three words as modifying the phrase “for redress of grievances” to include\
petitions for “purposes other” than the “redress of grievances.” The phrase “or other\
purposes” does not speak or relate to the granting of any special privileges or protections\
for those who exercise their rights under the Petition Clause. \
'

var WPFootnote14 = '
Hott v. Yarbrough, 245 S.W. 676 (Tex.Comm’n App. 1922, judgm’t adopted), also\
cited by Clark, is similar to Connellee. In Hott, the court held that the contents of a letter\
to a grand jury foreman were absolutely privileged because communications to the grand\
jury in the regular performance of its duties were subject to the common law rule applicable\
to judicial proceedings. Id. at 678. That the Hott court cites to a Vermont Supreme Court\
case, Harris v. Hunnington, 2 Tyl. 129, 1802 WL 777, (Vt. 1802), for a general discussion\
of the scope of absolute privileges is not persuasive authority that the Hott court intended\
to extend an absolute privilege to all petitioners. In Harris, the Vermont Supreme Court\
extended an absolute privilege to a petition addressed to the Vermont Legislature asking\
the legislative convention not to reappoint a particular Justice of the Peace. In Harris, the\
Vermont House of Representatives was empowered by its Constitution to impeach state\
criminals and acted as the “grand inquest of the State to charge such criminals.” As such,\
the Vermont Legislature acted in a capacity similar to that of a grand jury determinating\
whether to issue indictments. \
'

var WPFootnote15 = '
Wood v. State, 577 S.W.2d 477 (Tex.Crim.App. 1978), also cited by Clark, is\
anomalous. In Wood, the defendant challenged the constitutionality of the Penal Code\
provision making it a crime to file a false police report under the Petition Clause. The\
officer who was the subject of her complaint did not bring an action for defamation. \
Moreover, the court decided the case on the sufficiency of the evidence under the Penal\
Code provision making it a crime to file a false police report, ignored any constitutional\
issues, and tied its ruling to the case. Id. at 480 n.2. \
'

var WPFootnote16 = '
Examples where the privilege has been held to apply include statements made in\
correspondence sent, and conferences convened, in anticipation of litigation; in pretrial\
hearings, depositions, affidavits, pleadings or papers filed in the case; pleadings delivered\
to the media and settlement letters sufficiently connected with a pending or potential suit. \
Bennett, 932 S.W.2d at 201. \
'

var WPFootnote17 = '
This is an objective test. Whether Clark and/or Joe “believed” that Sessions and/or\
DOJ were under a duty to keep their communications confidential or their communications\
were absolutely privileged, is irrelevant. We also note the Memorandum contains no\
language, legends, or banners indicating the information contained therein was, or should\
be treated as, confidential. \
'

var WPFootnote18 = '
Likewise, United States v. Hylton, 558 F.Supp. 872 (D.C. Tex. 1982), aff’d, 710\
F.2d 1106 (5th Cir. 1983), is of no assistance to Clark’s appeal. In Hylton, the defendant\
sought an acquittal on federal charges of attempting to intimidate and impede an IRS\
investigation. After defendant filed a criminal complaint against two IRS agents, the IRS\
filed an action claiming defendant filed her complaint intending to obstruct an IRS\
investigation rather than assert her own rights. Id. at 874. No one alleged a claim for\
defamation. Rather, the IRS alleged the defendant attempted to utilize legal processes to\
attain an improper result. Here, Jenkins does not assert Clark improperly petitioned\
Congressman Sessions and DOJ, but that Clark defamed Jenkins in the process. \
'

var WPFootnote19 = '
In Bentley, the Texas Supreme Court observed:
\
\
                                           [i]f the First Amendment precluded consideration of credibility,\
the defendant would almost always be a sure winner as long\
as he could bring himself to testify in his own favor. His\
assertions as to his own state of mind, if they could not be\
disbelieved on appeal, would surely prevent proof of actual\
malice by clear and convincing evidence absent a ‘smoking\
gun’–something like a defendant’s confession on the verge of\
making a statement that he did not believe it to be true. The\
First Amendment does not afford even a media defendant\
such protection.
\
\
94 S.W.3d at 597.
\
'

var WPFootnote20 = '
Clark contends that Congressman Sessions’s testimony supports a finding that\
Clark acted in good faith. Although Sessions testified that he believed Clark acted in good\
faith, he also testified he read only the portion of the Clark Memorandum in which he and\
his office were named; he believed he had met Clark briefly once; and he could not testify\
whether Clark acted in good faith in connection with his involvement in Athens in\
November 2002. Congressman Sessions’s testimony regarding Clark’s good faith is\
equivocal at best and largely irrelevant because the actual malice test is a subjective one\
that focuses on the defendant’s state of mind. See New Times, 146 S.W.3d at 162;\
Bentley, 94 S.W.3d at 591. \
'

var WPFootnote21 = '
In paragraph three of the Clark Memorandum, Clark qualifies his accusation that\
the staff of Congressman Sessions’s Athens office have ties to the Ku Klux Klan with the\
statement–“there is a perception on the part of these citizens that . . . .” This qualification\
indicates Clark at least considered the need to qualify certain language in the\
Memorandum and either believed additional qualification was unnecessary or chose not\
to qualify other statements.
\
'

var WPFootnote22 = '
Regardless whether the jury found Joe’s testimony related to the coverpage\
credible, the test for “actual malice” focuses on Clark’s “belief in, or attitude toward, the\
truth of the communication at issue.” Accordingly, we focus on Clark’s subjective belief at\
the time he made the statements, not Joe’s subsequent actions. \
'

var WPFootnote23 = '
At trial, Jenkins produced a number of witnesses that corroborated her evidence:\
Charles Hawn (regional district office manager for Congressman Sessions), Pam Burton\
(Athens City Administrator), Elaine Jenkins (City Council person and plaintiff), and Jerry\
King (former Mayor of Athens). Clark did not appear at trial and did not call any members\
of the CCNA or other witnesses who attended the City Counsel workshop or after-meeting\
to rebut the testimony of Jenkins’s witnesses. \
'

var WPFootnote24 = '
In St. Amant, the facts were as follows:
\
\
                                St. Amant had no personal knowledge of Thompson’s activities; he relied\
solely on Albin’s affidavit although the record was silent as to Albin’s\
reputation for veracity; he failed to verify the information with those in the\
union office who might have known the facts; he gave no consideration to\
whether or not the statements defamed Thompson and went ahead heedless\
of the consequences; and he mistakenly believed he had no responsibility\
for the broadcast because he was merely quoting Albin’s words.
\
\
390 U.S. at 730, 88 S.Ct. at 1325.
\
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}







 NO. 07-06-0385-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D 

FEBRUARY 22, 2008

______________________________


PAUL MARTIN CLARK AND BLACK CITIZENS FOR JUSTICE, 
LAW AND ORDER, INC., APPELLANTS

V.

GLADYS ELAINE BLANTON JENKINS, APPELLEE

_________________________________

FROM THE 3RD DISTRICT COURT OF HENDERSON COUNTY; 

NO. 03-066; HONORABLE JIM PARSONS, JUDGE

_______________________________


Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.


OPINION


          Appellants, Paul Martin Clark and Black Citizens For Justice, Law and Order, Inc.
(BCJLO), appeal from a judgment rendered in favor of Appellee, Gladys Elaine Blanton
Jenkins, in a libel action. By a sole issue, Clark and BCJLO assert the trial court erred in
denying their motions for directed verdict and judgment notwithstanding the verdict
because: (1) the defamatory statements about Jenkins were made in a written request for
governmental action, making actual malice an essential element of her claim, and the
evidence was insufficient to establish actual malice, (2) their statements were absolutely
privileged because they were made in a petition for redress pursuant to the Texas
Constitution, and (3) there was an absence of any finding and/or evidence in support of a
presumed finding their petition was a “sham” or was made in bad faith. We affirm.
Background
          Jenkins,


 a member of the Athens City Council, filed an action for libel based upon
statements made in a memorandum (hereinafter the “Clark Memorandum”) authored by
Clark, BCJLO’s President. The Clark Memorandum was addressed and published to Daisy
Evella Joe, BCJLO’s Chief Executive Officer, the Honorable Pete Sessions, United States
Representative, and the United States Department of Justice (DOJ), Civil Rights Division. 
The Clark Memorandum was subsequently published to the Mayor of Athens, its City
Council, the City Administrator, and Police Chief. The existence of the Clark Memorandum
and its contents were generally known in Athens. 
          BCJLO was originally incorporated in 1969 in response to incidents involving black
citizens and police officers in the Dallas metropolitan area. BCJLO’s initial purpose was
to bring citizen complaints against the Dallas police to the attention of the proper
authorities. Over the years, BCJLO’s purpose has evolved to include assisting persons in
pursuing claims before the Equal Employment Opportunity Commission. 
          Joe became BCJLO’s volunteer director in 1982 and subsequently, CEO.


 Clark
became BCJLO’s President of Membership in 2002-03. He had received training and
certification as a federal records management officer at the National Archives located in
Washington, D.C. At the National Archives, Clark was taught to simply record an event
through note-taking without filtering what was said. Joe testified at trial that Clark had a
knack for notating meetings in a very detailed manner—writing down every “and,” “the,”
and “that.”   
          In the mid-nineties, tension existed between North Athens’ black citizens and the
Athens Police Department. DOJ’s Civil Rights Division assisted the parties in developing
an agreement designed to open lines of communication between the Athens Police
Department and the North Athens community. In 1999, a Memorandum Agreement was
entered into between Athens Police Chief, the NAACP, and an organization known as the
Concerned Citizens of North Athens (CCNA). A Citizens Advisory Committee was created
to meet on a regular basis with the Athens Police Chief to discuss problems and issues. 
If necessary, these issues and problems would be brought to the attention of the City
Council. The Texas Rangers also offered their assistance by investigating citizens’
complaints of harassment and intimidation. From 1999 until 2006, there were six 
complaints filed with the Citizens Advisory Committee.
          In mid-2001, Joe began receiving calls from black residents in Athens including
Barbara Bowman and Fred Burke. Bowman and Burke were CCNA members and,
subsequently, became BCJLO members. Bowman and Burke complained of intimidation
and harassment by the Athens Police Department and wanted BCJLO’s assistance
because they believed they did not have a voice in Athens. Joe received so many calls
from Athens’ citizens she was hesitant to get involved. Subsequently, they started calling
in on Joe’s radio show, Worker’s Beat, on KNON, with complaints related to the Athens
Police Department. Bowman and others called Joe’s radio show complaining that a
pregnant woman was taken to jail, underwent a miscarriage, and was refused medical
attention. Joe found the story hard to believe. She suggested they compile their
information and submit their complaints to the authorities.  
          In the Fall of 2002, Pam Burton, Athens City Administrator, received letters from Joe
Baggett, President of the NAACP’s local chapter, and Mickey Williams of the CCNA asking
to appear before the City Council to discuss the Memorandum Agreement. The agreement
had expired and a new Athens Police Chief, Jim Vance, was replacing the current Chief
who was a signatory to the Memorandum Agreement. Burton placed discussion of the
agreement on the City Council’s agenda. She also sent Baggett a letter, with a copy to
Williams, indicating the City Council would be discussing the agreement at a regularly
scheduled workshop to be held before the City Council meeting scheduled for November
20, 2002. Burton’s letter invited them to attend and encouraged them to invite other
interested parties. 
          CCNA members faxed Joe a letter related to the workshop and asked Joe to
approach Congressman Sessions. Joe indicated she would send someone to the meeting
to take notes on their concerns and then turn the information over to Sessions. Because
Joe was unable to attend the meeting personally, she asked Clark to attend. Clark was to
meet Reverend Stovall, Pastor of the Camp Wisdom United Methodist Church of Dallas,
in Athens, and accompany him to the meeting. 
          Bowman, Stovall, Clark, and others attended the City Council workshop to discuss
the agreement. Mayor King, the City Council members, and Burton were also present. 
Jenkins attended the meeting in her capacity as a City Council member.
          After the Council meeting, Bowman, Stovall, Clark, and other attendees convened
at the house of a CCNA member to discuss their concerns. Clark took notes during this
after-meeting. The meeting lasted approximately twenty minutes. Bowman told Clark that
Jenkins was controlled by Mayor King and that she was ineffective and failed to
communicate the concerns of the citizens of North Athens to the City Council.


 Joe
instructed Clark to take down their complaints and draft a memorandum that would prompt
an investigation by Congressman Sessions and DOJ’s Civil Rights Division. 
          Clark drove home that night, and the next morning he delivered his memorandum
to Joe. Joe testified she prepared a cover page,


 and the Clark Memorandum was
delivered to a staff member at Sessions’s office. The Clark Memorandum was also mailed
to DOJ’s Civil Rights Division. Although it was Joe’s practice to scan such a memorandum
before it was sent, she only glanced at the Clark Memorandum and did not notice the
criminal allegations related to Jenkins.
          In paragraph four of the Clark Memorandum, the following statement was made
regarding Jenkins:
The only black female Athens City Council member is Gladys Elaine Blanton
Jenkins. She is a convicted felon having served time in Texas and California
for Prostitution and Drugs. She is controlled by Mayor Jerry King. No one
in the State of Texas can hold elective office who has felony convictions. 
She must be removed from office immediately.
 
See Appendix for full text of the Clark Memorandum.
 
           Joe was unconcerned whether the statements in the Clark Memorandum were true
or false. Neither Clark, Joe, nor BCJLO performed any investigation to determine the
validity of any factual statements contained in the memorandum including the criminal
allegations against Jenkins.


 Joe agreed the memorandum’s statements regarding 
Jenkins were “very defamatory,” “horrible,” and she “wouldn’t want them published about
anyone.” She also believed the contents of the memorandum were confidential and she
was relying on Sessions and the DOJ to determine whether the statements made were
true.  
          Clark did not appear at trial, but testified by deposition. He indicated he had no
belief or disbelief as to the truth of the memorandum’s contents. He did not know Jenkins
and had no belief as to the statements he made about her. He did not know the people
who attended the Council meeting and after-meeting, and had no baseline for the veracity
of their statements. He stated he recorded the information the attendees supplied to him. 
He indicated, however, he did not believe the statement in his memorandum that “[t]he
Athens Police intimidate, harass and murder black residents on a daily basis.” If it was the
case, he stated he would have heard about it on television or in a newspaper. 
          After receiving the Clark Memorandum, Congressman Sessions attempted to learn
if there was any truth to the allegation tying Charles Hawn, Sessions’s only staff member
in the Athens office, to the Ku Klux Klan.


 Hawn received a call from a Dallas staff member
asking if he had seen the Clark Memorandum. Sessions’s Dallas office faxed the
memorandum to Hawn for comment. Hawn indicated he had no association or knowledge
of the BCJLO, Joe, or Clark. He had also never received any complaints from North
Athens citizens about a pattern, or instance, of murder or intimidation of black residents
by Athens police. He stated he absolutely had no ties to the Ku Klux Klan.
          Sessions’s office subsequently mailed the original Clark Memorandum to Mayor
King and faxed him a copy for his comments. King provided a copy of the memorandum
to Burton and Chief Vance. Burton arranged a meeting between King, Jenkins, and Vance
to determine whether there was any substance to the charges against Jenkins in the Clark
Memorandum. Jenkins was fingerprinted and criminal histories were run by the Athens
Police Department and the Texas Rangers. Neither found any criminal history. City
Council members also received a copy of the Clark Memorandum, held an Executive
Session to discuss its contents and determine what action, if any, the Council should take. 
The Council decided against taking action. 
          On February 23, 2003, Jenkins filed this suit against Clark and BCJLO for damages
due to defamation and libel. Jenkins’s claims were tried to a jury and after a two day trial,
the jury returned a verdict against Clark and BCJLO. Jenkins was awarded $300,000 for
past and future damages due to mental anguish, injury to character and/or reputation and
injury to her standing in the community. She was also awarded exemplary damages of
$100,000 against Clark and $100,000 against BCJLO. 
          At trial, the jury was given the following instruction on the “actual malice” element
of Jenkins’s cause of action, and they made the following findings: 
 
          Question No. 2

 
Do you find by clear and convincing evidence that Paul Martin Clark and/or
Black Citizens for Justice, Law and Order, Inc. acted with actual malice in
committing the libel, if any, against Gladys Elaine Blanton Jenkins?

 
a. Paul Martin ClarkYes

b. BCJLOYes

 
Instruction: Actual malice means the false statement was made with actual
knowledge that it was false or with reckless disregard of whether it was false.

Reckless disregard means the author actually entertained serious doubts as
to the truth of the statement.

 
“Clear and convincing evidence” which produces in the mind of the trier of
fact a firm belief or conviction as to the truth of the allegations sought to be
established.





Discussion





          Clark and BCJLO


 contend Jenkins failed to present clear and convincing evidence
of actual malice to controvert the testimony of Clark and Joe that the truth or falsity of the
statements in the Clark Memorandum was never considered. Because Clark never
considered whether the statements were true or false, he maintains he could not have
entertained any doubts as to their truth or falsity. He also asserts his statements were
absolutely privileged as a legitimate attempt to petition the government for a redress of
grievances under the Texas Constitution article 1, § 27. As such, he would have this Court
find his statements are not subject to Texas defamation laws. 
          Notwithstanding the order in which Clark briefed his issues, logic dictates that we
first consider whether his statements are absolutely privileged before proceeding to
consider the sufficiency of evidence of actual malice.
          

          I.        Right To Petition

          A.       Absolute Privilege





          Clark asserts the statements in his memorandum are subject to an absolute
privilege because the Texas Petition Clause provides greater protection for
communications made in petitions for redress than exist for those who generally exercise
their right to free speech. He contends the Free Speech and Petition Clauses establish
separate and distinct constitutional rights, the violation of which requires differing standards
for determining liability in defamation actions. Rather than permit plaintiffs to recover for
defamation against a petitioner for redress if they establish “actual malice” under the New
York Times standard


 in accord with the United States Supreme Court’s holding in
McDonald v. Smith,


 Clark would have this Court adopt the Noerr-Pennington doctrine
created by the United States Supreme Court for use in antitrust cases,


 and require such
plaintiffs to establish the petition itself is a “sham” before liability attaches. In sum, Clark
urges this Court to elevate communications under the Petition Clause to “special” First
Amendment status and accept his claim of absolute privilege. 
          The Petition Clause of the Texas Constitution reserves the right to petition the
government for a redress of grievances as follows:
RIGHT OF ASSEMBLY; PETITION FOR REDRESS OF GRIEVANCES. The
citizens shall have the right, in a peaceable manner, to assemble together
for their common good; and apply to those vested with the powers of
government for redress of grievances or other purposes, by petition, address
or remonstrance.
 
Texas Const. art. 1, § 27.


 
 
          Contrary to Clark’s assertion, the right to petition is inseparable from the right of free
speech. Puckett v. State, 801 S.W.2d 188, 192 (Tex.App.–Houston [14th Dist.] 1990),
cert. denied, 502 U.S. 990, 112 S.Ct. 606, 116 L.Ed.2d 629 (1991). “Although the rights
are distinct guarantees, they were cut from the same constitutional cloth, inspired by the
same principles and ideals. Thus, as a general rule, the rights are subject to the same
constitutional analysis.” Id. (citations omitted).
           That the Texas Constitution expressly guarantees a right to bring suits for
reputational torts and provides access to courts for injuries to reputation, supports the
notion that First Amendment speech safeguards should apply to those who petition for
redress.


 Nowhere in the Petition Clause is there language that militates against applying
these free speech safeguards to petitioners, or that supports any “special” First
Amendment status for petitioners.


 Rather, defamation defendants seeking greater
protection than that offered by the Texas and United States Constitutions must look to
Texas common law. The Texas Supreme Court has observed:
[a]lthough we have recognized that the Texas Constitution’s free speech
guarantee is in some cases broader than the federal guarantee, we have
also recognized that ‘broader protection, if any, cannot come at the expense
of a defamation claimant’s right to redress.’ Unlike the United States
Constitution, the Texas Constitution expressly guarantees the right to bring
reputational torts. The Texas Constitution’s free speech provision guarantees
everyone the right to ‘speak, write or publish his opinions on any subject,
being responsible for abuse of that privilege.’ Likewise, the Texas
Constitution’s open courts provision guarantees that ‘[a]ll courts shall be
open, and every person for an injury done him, in his lands, goods, person
or reputation, shall have remedy by due course of law.’ While we have
occasionally extended protections to defamation defendants greater than
those offered by the United States Constitution, we have based these
protections on the common law, not the Texas Constitution.
 
Bentley v. Bunton, 94 S.W.3d 561, 578 (Tex. 2003) quoting Turner v. KTRK Television,
Inc., 38 S.W.3d 103, 116-17 (Tex. 2000) (emphasis in original).
          Thus, unless Texas common law creates an exception, persons who exercise their
right to petition do so in the absence of absolute immunity and may be held liable for their
communications if the plaintiff is able to make a showing sufficient to satisfy the New York
Times standard for “actual malice.” We also find the United States Supreme Court’s
holding in McDonald v. Smith, persuasive and agree that, although “[t]he right to petition
is guaranteed, the right to commit libel with impunity is not.” 472 U.S. at 485, 105 S.Ct. at
2790.
          In McDonald, the plaintiff was a candidate for appointment as a United States
Attorney. The defendant sent defamatory letters to various federal governmental officials,
including President Reagan, concerning the plaintiff’s ethical qualifications to serve as
United States Attorney. Based upon those communications, the plaintiff sued for
defamation. The defendant argued the Petition Clause of the First Amendment, which
guarantees “the right of the people . . . to petition the Government for a redress of
grievances,” should provide him with absolute immunity. Id. The Court disagreed, noting
that “[u]nder state common law, damages may be recovered only if [the defendant] is
shown to have acted with malice . . . .” Id. The Court held that requiring plaintiffs to show
actual malice was sufficient protection for petitioners, and “the Petition Clause does not
require the State to expand this privilege into an absolute one.” Id.  
          The McDonald ruling is compatible with Texas common law which recognizes two
classes of privileges -- absolute and qualified -- either of which may apply to a petition for
redress. Two cases are illustrative. In Koehler v. Dubose, 200 S.W. 238
(Tex.Civ.App.–San Antonio 1918, writ ref’d), the court considered allegations of libel
contained in letters addressed to the state comptroller related to the issuance of a new
liquor license to the plaintiff. The letters accused the plaintiff of selling alcohol to minors
through others and petitioned the state comptroller, who had authority to grant, revoke, or
refuse licenses to sell intoxicating liquor, to refuse to issue a new license. The court
recognized that, under the common law, there were two classes of privilege that might
apply to petitioners’ communications -- absolute and qualified. Id. at 242. After finding the
letters were not part of a judicial proceeding and subject to an absolute privilege, the court
found the communications were subject to a qualified privilege and stated, “the publishers
of the statements will be guilty of libel if it be shown that the accusations were made in bad
faith and with malice towards appellant.” Id. at 243.
          In Connellee v. Blanton, 163 S.W. 404 (Tex.Civ.App.–Fort Worth 1913, writ ref’d),
the court extended the absolute privilege recognized under the common law for statements
made in judicial proceedings to petitions to the Governor requesting pardons. In
Connellee, plaintiff’s petition, a letter applying to the Governor for a pardon, complained
that a district judge had changed the venue of the defendant’s case for the purpose of
making the costs excessive. Id. at 405. The Connellee court also recognized two classes
of privilege, qualified and absolute, that might apply but determined the petition was subject
to an absolute privilege because it was an extension of the judicial proceedings whereby
the person sought to be pardoned was convicted. Id. at 407. The Connellee court held:
[t]he same principle of public policy which supports the absolute privilege
extended to judicial proceedings applies with equal force in favor of petitions
to the Governor of the state for the exercise of the pardoning power, a power
superior to that of the court which rendered the judgment of conviction. If the
judicial proceedings which culminated in the conviction were absolutely
privileged, why should not the same immunity be extended to the petition to
a higher power to annul that judgment, in part? 
 
Id.
 
          Thus, the courts’ rulings in Koehler and Connellee on the issue of whether a petition
is subject to an absolute or qualified privilege under the common law turned on whether
the petition was submitted in connection with a judicial proceeding. The Koelher court
recognized the principle that, at a minimum, all petitions are subject to a qualified privilege
under the common law, and Connellee recognized an absolute privilege where the petition
is submitted as an extension of a judicial proceeding.


 Neither court recognized an
absolute privilege for all communications under the Petition Clause.



          Accordingly, when a person exercises their constitutional right to petition for redress,
their communications may be subject to an absolute privilege or qualified privilege
depending on the context, or occasion, in which their communication is made. See
Koehler, 200 S.W. at 242-43. An absolute privilege is analogous to an immunity because
absolutely privileged communications are not actionable and may not form the basis for
civil liability, Reagan v. Guardian Life Ins., Co., 140 Tex. 105, 166 S.W.2d 909, 911 (1942);
Randolph v. Walker, 29 S.W.3d 271, 278 (Tex.App.–Houston [14th Dist.] 2000, pet.
denied), even though the communication is false and published with express malice. 
Associated Telephone Directory Publishers, Inc. v. Better Business, 710 S.W.2d 190, 192
(Tex.App.–Corpus Christi 1986, writ ref’d. n.r.e.). This privilege attaches to
communications made in proceedings of legislative, executive, and judicial bodies, Zarate
v. Cortinas, 553 S.W.2d 652, 654 (Tex.Civ.App.–Corpus Christi 1977, no writ), and to only
a limited and select number of situations which involve the administration of the functions
of the branches of government such as the opinions of judges and the speeches of
members of congress or legislatures. Hurlbut v. Gulf Atlantic Life Insurance Co., 749
S.W.2d 762, 768 (Tex. 1987); Knapp & Co. v. Campbell, 36 S.W. 765, 767
(Tex.Civ.App.–El Paso 1896, no writ). 
          Absolute privilege attaches to all communications published in the course of judicial
proceedings, IBP, Inc. v. Klumpe, 101 S.W.3d 461, 470 (Tex.App.–Amarillo 2001, pet.
denied), and similarly applies to quasi-judicial proceedings before executive officers,
boards, or commissions. Reagan, 166 S.W.2d at 912; 5-State Helicopters, Inc. v. Cox,
146 S.W.3d 254, 256-57 (Tex.App.–Fort Worth 2004, pet. denied). To apply, the
executive officer, board, or commission must exercise quasi-judicial powers. Putter v.
Anderson, 601 S.W.2d 73, 76 (Tex.Civ.App.–Dallas 1980, writ ref’d. n.r.e.). That is, the
governmental entity must have the authority to investigate and decide the matters at issue,
5-State Helicopters, Inc.,146 S.W.3d at 259; Crain v. Smith, 22 S.W.3d 58, 60-61
(Tex.App.–Corpus Christi 2000, no pet.); Lane v. Port Terminal R.R. Ass’n, 821 S.W.2d
623, 625 (Tex.App.–Houston [14th Dist.] 1991, pet. denied), and the communication must
bear some relationship to a pending or proposed judicial proceeding in order for the
absolute privilege to apply. Bennett v. Computer Assocs. Int’l., Inc., 932 S.W.2d 197, 201
(Tex.App.–Amarillo 1996, writ denied).


 
          Clearly, all communications to public officials are not absolutely privileged. Hurlbut,
749 S.W.2d at 768. Initial communications “to a public officer . . . who is authorized or
privileged to take action” are subject to only a qualified privilege, not absolute immunity. 
Id. The filing of a criminal complaint is not absolutely privileged because, at that point, no
judicial proceedings have been proposed and no investigating body has discovered
sufficient information to present to a grand jury or file a misdemeanor complaint. San
Antonio Credit Union v. O’Connor, 115 S.W.3d 82, 99 (Tex.App.–San Antonio 2003, pet.
denied). See Caller Times Pub. Co. v. Chandler, 122 S.W.2d 249, 251 (Tex.Civ.App.–San
Antonio 1938), aff’d, 130 S.W.2d 853 (Tex. 1939) (confessions under oath to a district
attorney implicating plaintiff in the commission of a crime not absolutely privileged);
Houston Chronicle Pub. Co. v. Tiernan, 171 S.W. 542, 546 (Tex.Civ.App.–Galveston 1914,
no writ) (affidavits alleging attorneys committed crimes were not absolutely privileged). 
Thus, the initial communication of alleged wrongful or illegal acts to an official authorized
to protect the public from such acts is subject to a qualified privilege. See Hurlbut, 749
S.W.2d at 767-68 (criminal allegations made to assistant attorney general not absolutely
privileged); Zarate, 553 S.W.2d at 655.
          This common law “qualified privilege” has been described as follows:
[q]ualified privileges against defamation exist at common law when a
communication is made in good faith and the author, the recipient or a third
person, or one of their family members, has an interest that is sufficiently
affected by the communication. See Holloway v. Texas Medical Ass’n, 757
S.W.2d 810, 813 (Tex.App.–Houston [1st Dist.] 1988, writ denied). A
communication may also be conditionally privileged if it affects an important
public interest. See generally Bruce W. Sanford, Libel and Privacy, at 701-94.1 (collecting libel privilege statutes from all fifty states).
 
Cain v. Hearst Corporation, 878 S.W.2d 577, 582 (Tex. 1994). 
          Unlike an absolute privilege, this “conditional privilege is defeated when the privilege
is abused,” Hurlbut, 749 S.W.2d at 768, and the “qualifying criterion . . . is that the
statements must be made in good faith and without malice.” Zarate, 553 S.W.2d at 655
(collected cases cited). To hold otherwise would “unnecessarily deny those innocent
victims of maliciously or recklessly filed complaints an opportunity to seek remuneration
for their injury.” Id. In making a determination whether statements are subject to a
qualified privilege, courts must examine the “occasion” of the communication, i.e., the
totality of the circumstances including the communication itself, its communicator, its
recipient and the relief sought. Cranfill v. Hayden, 55 S.W. 805, 809 (Tex.Civ.App.–Dallas
1900, no writ).


 And, the question of privilege is ordinarily one of law for the court. Denton
Publishing Co. v. Boyd, 460 S.W.2d 881, 884 (Tex. 1970). 
          Clark addressed his Memorandum to Congressman Sessions and DOJ’s Civil
Rights Division. By his Memorandum, Clark generally sought to instigate an investigation
of alleged civil rights violations in Athens and, more specifically, Jenkins’s immediate
removal from the Athens City Council. As such, the Clark Memorandum was a preliminary
report, not communicated to Congressman Sessions as part of a legislative proceeding. 
Moreover, Congressman Sessions lacked the subpoena power necessary to conduct a
formal investigation as well as the authority to grant the ultimate relief sought by Clark. At
best, the Congressman could make calls, gather information, and refer Clark’s allegations
to public officials and/or agencies empowered to investigate, litigate, or adjudicate Clark’s
complaints. Congressman Sessions’s ability to gather information and refer matters to the
appropriate authorities does not constitute a “legislative proceeding.” See Belo v. Wren,
63 Tex. 686, 1884 WL 8996, *26-27 (Dec. 19, 1884). Thus, Clark’s statements to
Congressman Sessions were not part of a legislative proceeding and were not subject to
an absolute privilege. Neither were Clark’s statements to DOJ’s Civil Rights Division
communicated in an executive, judicial, or quasi-judicial proceeding.
          A privilege “is an affirmative defense to be proved and is in the nature of confession
and avoidance.” IBP, Inc., 101 S.W.3d at 471. As such, Clark had the burden of
establishing this affirmative defense to defamation. Id. Clark produced no evidence
indicating DOJ was actively contemplating, investigating, or litigating any civil rights
violations related to Athens. In addition, Clark’s allegations were preliminary in nature, i.e.,
designed to launch an investigation that might lead to legal action. Thus, Clark’s
statements to DOJ were not part of an executive, judicial, or quasi-judicial proceeding, and
were not subject to an absolute privilege.
          Under Texas common law, damages for defamation and libel may be recovered only
if a defendant is shown to have acted in bad faith with malice. Zarate, 553 S.W.2d at 655;
Koehler, 200 S.W. at 243. This standard is consistent with that expressed by the United
States Supreme Court in New York Times, supra, and is applicable to a plaintiff’s claims
against those who have exercised their First Amendment right under the Petition Clause. 
McDonald, 472 U.S. at 485, 105 S.Ct. at 2791. See generally Dixon v. Southwestern Bell
Tel. Co., 607 S.W.2d 240, 242 (Tex. 1980); Little v. Bryce, 733 S.W.2d 937, 945
(Tex.App.–Houston [1st Dist.] 1987, no writ]. While we recognize the Petition Clause is
undoubtedly an important part of self-government, one person’s right to petition, in the
absence of a common law privilege that is absolute, ends where his neighbor’s reputational
rights begin. Like the McDonald court, we are not prepared to conclude that the Petition
Clause “include[s] an unqualified right to express damaging falsehoods in exercise of that
right.” 472 U.S. at 484, 105 S.Ct. at 2790.
          We also decline to apply the “sham exception” doctrine established by the United
States Supreme Court for antitrust litigation, i.e., the Noerr-Pennington doctrine. See City
of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 379-80, 111 S.Ct. 1344,
1353-54, 113 L.Ed.2d 382 (1991). The Noerr-Pennington doctrine basically holds that
petitioning the government to take anticompetitive action does not violate antitrust laws. 
Id. The Omni court described the doctrine as follows:
[a] classic example is the filing of frivolous objections to the license
application of a competitor, with no expectation of achieving denial of the
license but simply in order to impose expense and delay.
 
Id. 
 
           The Noerr-Pennington doctrine has no application here. Jenkins filed suit for
defamatory statements made in a memorandum intended to instigate an investigation by
the federal government and thereby result in her removal from office. Jenkins did not sue
Clark for improperly attempting to influence governmental decision-making or obtain an
unlawful economic result, i.e., anticompetitive action. We recognize, as did the Omni
Court, that the Noerr-Pennington doctrine is “tailored . . . for the business world,” id., and
find the United States Supreme Court’s holding in McDonald to be apropos.


 Having
concluded the statements in the Clark Memorandum are subject to a qualified privilege
permitting liability in a defamation action if his statements were made with actual malice,
we may now consider his contention that Jenkins failed to prove actual malice by clear and
convincing evidence
          II.       Actual Malice
          A public figure may not recover damages for a defamatory falsehood without clear
and convincing proof the false statement was made with “actual malice,” i.e., with
knowledge the statement was false or with reckless disregard of whether it was false or
not. Doubleday & Co., Inc. v. Rogers, 674 S.W.2d 751, 755 (Tex. 1984); New York Times
Co., 376 U.S. at 279-280, 84 S.Ct. at 726. Although a bright line definition of “clear and
convincing evidence” for purposes of determining actual malice does not exist, the phrase
has been used to mean evidence which produces in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations to be established, or evidence sufficient
to support a firm conviction that the fact to be proved is true. Bentley, 94 S.W.3d at 596-97; Huckabee v. Time Warner Entertainment Co., 19 S.W.3d 413, 422 (Tex. 2000). 
          Knowledge that the statement is false is a “relatively clear standard; reckless
disregard is much less so.” Bentley, 94 S.W.3d at 591. Reckless disregard is a subjective
standard focusing on the declarant’s belief in, or attitude toward, the truth of the
communication at issue. New Times v. Isaacks, 146 S.W.3d 144, 165 (Tex. 2004). The
standard requires more than a departure from conduct that is reasonably prudent. Mere
negligence is not enough. Bentley, 94 S.W.3d at 591. There must be evidence the
defendant made the false publication with a high degree of awareness of probable falsity,
or entertained serious doubts as to the truth of his publication. Harte-Hanks
Communications, Inc. v. Connaughton, 491 U.S. 657, 667, 109 S.Ct. 2678, 2686, 105
L..Ed.2d 562 (1989). For instance, a failure to investigate by itself does not evidence a
reckless disregard for the truth, but evidence that a failure to investigate was contrary to
the speaker’s usual practice and motivated by a desire to avoid the truth may demonstrate
the reckless disregard necessary for a finding of actual malice. Bentley, 94 S.W.3d at 591.
          While recognizing that the test for reckless disregard “may be said to put a premium
on ignorance, encourage the irresponsible publisher not to inquire, and permit the issue
to be determined by the defendant’s testimony that he published the statement in good
faith and unaware of its probable falsity,” St. Amant v. Thompson, 390 U.S. 727, 732, 88
S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968), the United States Supreme Court has cautioned
that: 
[t]he defendant in a defamation action brought by a public official cannot,
however, automatically insure a favorable verdict by testifying that he
published with a belief that the statements were true. The finder of fact must
determine whether the publication was indeed made in good faith. 
Professions of good faith will be unlikely to prove persuasive, for example,
where a story is fabricated by the defendant, is the product of his
imagination, or is based wholly on an unverified anonymous telephone call. 
Nor will they be likely to prevail when the publisher’s allegations are so
inherently improbable that only a reckless man would have put them in
circulation. Likewise, recklessness may be found where there are obvious
reasons to doubt the veracity of the informant or the accuracy of his reports.
 
Id.
 
          In addition, although courts must be careful not to place too much reliance on
factors such as motive, a plaintiff is entitled to prove the defendant’s state of mind through
circumstantial evidence. Bentley, 94 S.W.3d at 591; Harte-Hanks, 491 U.S. at 668, 109
S.Ct. at 2685. A lack of care or an injurious motive in making a statement is not alone
proof of actual malice, but care and motive are factors to be considered. Bentley, 94
S.W.3d at 596. Moreover, although an understandable misinterpretation of ambiguous
facts does not show actual malice, inherently improbable assertions and statements made
on information that is obviously dubious may show actual malice. Hearst Corp. v. Skeen,
159 S.W.3d 633, 638 (Tex. 2005). Actual malice may be inferred from the “relation of the
parties, the circumstances attending the publication, the terms of the publication itself, and
from the defendant’s words or acts before, at, or after the time of the communication.” 
Dolcefino v. Turner, 987 S.W.2d 100, 111-12 (Tex.App.–Houston [14th Dist.] 1998), aff’d,
38 S.W.3d 103 (Tex. 2000). 
           In Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct.
1949, 80 L.Ed.2d 502 (1984), the United States Supreme Court held that judges have a
constitutional duty to “exercise independent judgment and determine whether the record
establishes actual malice with convincing clarity” in defamation suits brought by public
officials. 466 U.S. at 514, 104 S.Ct. at 1967. In determining whether the constitutional
standard has been satisfied, the reviewing court must consider the factual record in full,
Harte-Hanks, 491 U.S. at 688, 109 S.Ct. at 2696, and determine whether the evidence in
the record is sufficient to support a finding of actual malice as a matter of law. Bentley, 94
S.W.3d at 597-98. 
          In making credibility determinations the reviewing court must make an independent
examination of the statements at issue and the circumstances under which they were
made to see whether they are of a character which the principles of the First Amendment
protect. New York Times Co., 376 U.S. at 285, 84 S.Ct. at 728-29. Where the credibility
of witnesses is a factor in determining whether the constitutional standard has been
satisfied, “the First Amendment does not forbid any deference to a fact finder’s
determinations; it limits that deference.” Bentley, 94 S.W.3d at 598.


 The findings the jury
must have made to reach its verdict are considered alongside the undisputed evidence to
determine whether the plaintiff has met its burden of proof on the element of actual malice. 
Harte-Hanks, 491 U.S. at 690-91, 109 S.Ct. at 2678.
          Thus, we follow the approach set forth in Bentley and Harte-Hanks. First, we begin
with a determination of the evidence the jury must have found incredible. Bentley, 94
S.W.3d at 599. If the fact finder chose to disregard the defendant’s testimony, so must we,
so long as the jury’s credibility determinations are reasonable. Id. However, “it is not
enough for the jury to disbelieve defendant’s testimony,” Casso v. Brand, 776 S.W.2d 551,
558 (Tex. 1989), the credible evidence must rise to the level of clear and convincing. 
Bentley, 94 S.W.3d at 599. Thus, once we have resolved credibility determinations in favor
of the jury’s verdict, we must independently evaluate the statements at issue and the
circumstances under which they were made to see whether they are of a character which
the principles of the First Amendment protect. Turner, 38 S.W.3d at 120. We then identify
the undisputed facts and make a determination whether the “undisputed evidence along
with any other evidence that the jury could have believed provides clear and convincing
proof of actual malice.” Bentley, 94 S.W.3d at 599. 
          A. Evidence The Jury Found Not Credible
          The jury’s finding that Clark acted with actual malice does not differentiate whether
Clark had actual knowledge the statements regarding Jenkins were false or acted with
reckless disregard of whether the statements were false, but we know, based upon the
definition of actual malice given to the jury, that it was one or the other. That said, the
jury’s finding supports an inference that the jury believed, by clear and convincing
evidence, that Clark either knew the statements were false, or he actually entertained
serious doubts as to the truth of the statements. 
          Neither Clark nor Joe offered any evidence that they believed the statements were
true or made in good faith at the time they were published.


 Rather, Clark and Joe
testified the statements were published without a point of reference that would assist them
in determining the veracity of their sources or the truthfulness of the statements about
Jenkins, and performed no investigation to determine the accuracy of the information. 
          In essence, Clark testified he was just a scrivener. He stated he simply wrote down,
or recorded, what was said by the attendees at the Council meeting and gathering
afterwards. He had no belief or disbelief as to the truth of the statements contained in his
Memorandum. He had no basis for believing or disbelieving the speakers at the meeting. 
If the jury determined Clark knew the statements were false, Clark’s testimony must be
ignored. Bentley, 94 S.W.3d at 599. To the extent the jury determined that Clark actually
entertained serious doubts as to the truth of the statements, his testimony must also be
ignored. Id. 
          Clark also identified Barbara Bowman as a person at the after-meeting who told him
Jenkins was a convicted felon and served time in Texas and California for prostitution and
drugs. To the contrary, Barbara Bowman testified at trial in the plaintiff’s case-in-chief that
Fred Burke told Clark that Jenkins had engaged in drugs and prostitution in California, but
said nothing about Texas, Jenkins serving time in prison, or being convicted. Bowman
unequivocally testified no one at the meeting accused Jenkins of being a convicted felon. 
Clark did not appear at trial. Rather, Clark’s deposition testimony was read. Neither did
Clark’s counsel call Burke to testify. Given the jury’s finding regarding actual malice, we
ignore Clark’s testimony and find the jury determined Bowman’s testimony to be credible.
          B.       The Clark Memorandum
          The Clark Memorandum falsely stated that Jenkins was “a convicted felon having
served prison time in Texas and California for Prostitution and Drugs.” The Memorandum
was addressed to a United States Congressman and DOJ’s Civil Rights Division. Based
upon this statement, Clark unequivocally demanded Jenkins “be removed from office
immediately.” 
          The law does not allow someone the unrestricted right to publish statements about
public officials that are untrue, and in upholding this principle the courts of this State have
held that, “[a]s a general rule a publication concerning a public officer, in order to be
libelous per se, must be of such a character as, if true, would subject him to removal from
office.” Fitzjarrald v. Panhandle Publishing Co., 149 Tex. 87, 228 S.W.2d 499, 503 (1950);
Rawlins v. McKee, 327 S.W.2d 633, 637 (Tex.Civ.App.–Texarkana 1959, writ ref’d. n.r.e.)
(collected cases cited therein); see 50 Tex.Jur. 3d Libel and Slander §34 (2000); Marshal
v. Mahaffey, 974 S.W.2d 942, 949 (Tex.App.–Beaumont 1998, pet. denied); Houston
Chronicle Pub. Co. v. Flowers, 413 S.W.2d 435, 438 (Tex.Civ.App.–Beaumont 1967, no
writ). Libel per se means the written or printed words are so obviously hurtful to the person
aggrieved that they require no proof of their injurious character to make them actionable. 
Morrill v. Cisek, 226 S.W.3d 545, 549-50 (Tex.App.–Houston [1st Dist.] 2006, no pet.).
          Having considered the statement in issue and the circumstances under which it was
made, we find that the Clark Memorandum is not of a character that should receive
protection under the principles of the First Amendment. “The Constitution seeks to secure
liberty and not licentiousness.” Koehler, 200 S.W. at 244. 
          C.       Clear and Convincing Proof of Actual Malice
          A plaintiff is entitled to prove the defendant’s state of mind through circumstantial
evidence. Bentley, 94 S.W.3d at 591; Harte-Hanks, 491 U.S. at 668, 109 S.Ct. at 2685. 
In general, the Texas and United States Supreme Courts recognize three types of
circumstantial evidence that would likely support a finding of actual malice: (1) where a
story is fabricated by the defendant, is the product of his imagination, or is based wholly
on an unverified, anonymous account; (2) when the allegations made are so inherently
improbable that only a reckless man would have put them in circulation; and (3) there are
obvious reasons to doubt the veracity of the informant or the accuracy of his reports. 
Bentley, 94 S.W.3d at 596; St. Amant, 390 U.S. at 732, 88 S.Ct. at 1326. The Clark
Memorandum must also be construed as a whole, in light of the surrounding circumstances
based upon how a person of ordinary intelligence would perceive the entire statement. 
See Turner, 38 S.W.3d at 114; Wood v. Dawkins, 85 S.W.3d 312, 317 (Tex.App.–Amarillo
2002, pet. denied). 
          Our analysis begins with the origination of the Clark Memorandum. Clark testified
he took notes at the after-meeting and simply recorded what the attendees stated. He
testified that everything in his Memorandum originated with statements people made at the
after-meeting. Clark also testified he was trained as a federal records management officer
to objectively record events, and Joe testified Clark was sent to Athens because of his
detailed note-taking abilities. Furthermore, Clark testified he had no belief or disbelief
regarding his statement about Jenkins.
          We have already determined that the jury’s answer to the charge indicates that they
disbelieved Clark’s testimony that he had no belief or disbelief as to the truth or falseness
of his statement about Jenkins and that they could have believed Bowman’s testimony that
Clark did not learn all of the information contained in his statement about Jenkins at the
after-meeting. Therefore, relying on Bowman’s testimony and Clark’s testimony that his
information came only from statements at the after-meeting, the jury could have inferred
he “made up” or “imagined” the facts underlying his statement related to Jenkins. We find
this inference reasonable and supported by the evidence. 
          Clark and Joe testified Clark was dispatched to Athens to take notes of what
transpired and draft a memorandum to prompt an investigation by Congressman Sessions
and DOJ. The Clark Memorandum is clearly an “action” memorandum, i.e., an advocacy
document designed not only to prompt an investigation, but to remove Jenkins from office
immediately. Nowhere in the Memorandum are the facts or information described as
merely the recordation of statements made during meetings of Athens’s city government
or its concerned citizens. Rather, Clark describes himself as an eyewitness in attendance
at the City Council workshop and, with the exception of one paragraph,


 his factual
recitations and opinions are wholly unqualified. The Clark Memorandum’s authoritative
tone, unqualified language, use of the first person, formal format, and author’s signature
line, give the appearance Clark is writing with some command of the facts underlying his
discrimination claims. Regardless whether Clark was simply a note-taker at the Athens
meetings, when he returned to Dallas and drafted the memorandum, he plainly became
an advocate for an investigation in Athens and Jenkins’s removal from office.


 
          Moreover, there was substantial testimony at trial that a significant number of
additional allegations in the Clark Memorandum were untrue and Clark’s “eyewitness
account” of the City Council workshop was a gross misrepresentation of the events that
transpired.


 The uncontroverted testimony indicated it was not true that: black people
were being murdered on a daily basis in Athens; a black man was killed by the Athens
police some three weeks prior to the Clark Memorandum; a black woman was tortured by
the Athens Police Department and denied medical care; Vance was at the helm of the
Garland Police Department when a racial incident occurred; Athens recruited its new police
chief because of his racist credentials; peaceful picketing was not allowed in Athens; and 
picketers were harassed. 
          Regarding Clark’s “eyewitness account” of what transpired at the City Council
workshop, the uncontroverted testimony indicated it was not true that the Mayor told only
black people to leave the meeting; the Mayor vented extreme hatred by telling the black
attendees he did not appreciate the attendance of outsiders; black citizens were refused
copies of the minutes of the meeting; the workshop never took place and was a mere
future agenda item; only three people were allowed to speak at the workshop; workshop
only lasted nine minutes; and black citizens were told to meet with the new police chief
individually, not as a group.
          Thus, the uncontroverted evidence indicates Clark purposefully drafted an
incendiary instrument designed to prompt an investigation in Athens and remove Jenkins
from office. Given the gross discrepancies regarding Clark’s account of what transpired
at the City Council workshop and apparently false allegations and statements contained
in his Memorandum, a jury could readily infer that Clark misrepresented facts and stated
false allegations and opinions in order to attain his predetermined goals. This includes
embellishing Burke’s allegations related to Jenkins to include convictions as well as
imprisonment in multiple states. See Masson v. New Yorker Magazine, Inc., 501 U.S. 496,
517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991) (deliberate alteration of a statement
resulting in a material change in the meaning conveyed by the statement is proof of
reckless disregard); Cantrell v. Forest City Publishing Co., 419 U.S. 245, 253, 95 S.Ct. 465,
470-71, 42 L.Ed.2d 419 (1974) (where reporter fabricated and imagined false facts for
purposes of bolstering theme of feature article, jury was “plainly justified” in finding that
reporter portrayed the Cantrells in a false light through knowing or reckless untruth);
Carson v. Allied News Company, 529 F.2d 206, 213 (7th Cir. 1976) (defendants, in
fabricating and imagining facts, necessarily entertained serious doubts as to the truth of
the statements and had a high degree of awareness of their probable falsity).
          In reaching our conclusion, we find two cases instructive. In Cantrell, a reporter was
writing a feature article discussing the impact upon a family whose father died in a well-documented bridge collapse. 419 U.S. at 247, 95 S.Ct. 467. The reporter visited the
Cantrell’s residence where he interviewed Cantrell’s children. Although Mrs. Cantrell was
not at home, his article contained a description of her demeanor as well as a statement
attributed to her. The article also contained significant misrepresentations pertaining to the
dilapidated state of the Cantrell home and their poverty condition. Based upon these facts,
the Cantrell Court affirmed a jury finding and appellate determination that the reporter and
his publisher had “published knowing or reckless falsehoods about the Cantrells.” 419 U.S.
at 252-53, 95 S.Ct. at 470. 
          In Guam Federation of Teachers, Local 1581, of the American Federation of
Teachers v. Ysrael, 492 F.2d 438 (9th Cir. 1974), cert. denied, 419 U.S. 872, 95 S.Ct. 132,
42 L.Ed.2d 111 (1974), the defendant caused various defamatory statements concerning
a Union and its officers opposed to his appointment to a school board to be published in
a newspaper. The court determined that the defendant’s testimony at trial as an adverse
witness was sufficient alone to get the plaintiffs to the jury under the New York Times
standard and described his testimony as follows:
[h]e repeatedly admitted that he did not know whether what he said was true. 
He repeatedly admitted that he did nothing, or almost nothing, to verify his
charges. As to most of his statements, he repeatedly admitted that he knew
of no facts to support them; he either relied upon unspecified rumor or
nothing at all. He simply asserted that he believed what he said was true.
 
Id. at 439.
 
          Given the facts presented at trial, the jury could have reasonably inferred that Clark
either falsely reported the information he received about Jenkins at the after-meeting, or
imagined additional facts he was not told to further his purpose of seeking an investigation
of her past activities or immediate removal from office. This inference is reasonable under
circumstances where the Clark Memorandum itself is riddled with numerous other
falsehoods, misrepresentations, and innuendoes designed to achieve his predetermined
result.
          Like the defendant in the Guam Federation case, Clark also repeatedly admits he
did not know whether the statements related to Jenkins were true; he did nothing to verify
the alleged criminal convictions and knew of no facts to support the statements. According
to Clark, he relied on the word of complete strangers who were interested parties with
whom he had no reference for determining the veracity of what they were telling him about
a person he had never met. Although the defendant in Guam Federation at least testified
he believed his statements to be true, Clark testified he had no belief, good faith or
otherwise, in the truth of his statements about Jenkins. The behavior exhibited by Clark
is more than reckless disregard of the truth or falsity of the information he published – it is
simply no regard. 
          Putting aside for a moment the evidence indicating Clark “made up” or “imagined”
the information, the jury’s verdict is also buttressed by the “inherently improbable” nature
of the statements in the Clark Memorandum, i.e., an elected, sitting official had earlier been
convicted and imprisoned in two states for crimes related to drugs and prostitution. This
is even more so where one of the crimes allegedly committed was in the very state where
the person is serving office, and the validity of the claims could be easily determined by a
public records search. See Burger v. McGilley Memorial Chapels, Inc., 856 F.2d 1046,
1052 (8th Cir. 1988) (jury could find employer did not rely in good faith on employee’s
statement easily refutable either by confronting the former employee or making a simple
check of the employer’s records). 
          All this, in addition to Clark’s departure from his training and past performance as
a detailed, objective note-taker and the fact that Clark did not perform a simple public
records check despite his apparent disbelief regarding the extreme allegations being made
about the routine murder of black citizens in Athens coupled with the complete absence
of any information regarding the veracity of his sources, provide more than adequate
support for a finding of actual malice by clear and convincing evidence. See Goldwater v.
Ginsburg, 414 F.2d 324, 337 (2nd Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24
L.Ed.2d 695 (1970), reh’g denied, 397 U.S. 978, 90 S.Ct. 1085, 25 L.Ed.2d 274 (1970)
(“[r]epetition of another’s words does not release one of responsibility if the reporter knows
that the words are false or inherently improbable, or there are obvious reasons to doubt
the veracity of the person quoted or the accuracy of his reports”).
          Clark asserts this case is most similar to St. Amant v. Thompson. In St. Amant, a
candidate for public office, the defendant, St. Amant, made a televised speech in which he
quoted a statement from a single source, Albin, who indicated that the plaintiff, Thompson,
had engaged in criminal activity. The Supreme Court determined there was nothing in the
record to indicate any awareness by the defendant of the probable falsity of the source’s
statement and that a failure to investigate alone does not itself establish bad faith. 390
U.S. at 732-33, 88 S.Ct. at 1326. At first blush, these facts appear somewhat similar to our
own.


 There is, however, a defining difference between St. Amant and this case. Here,
none of the statements made to Clark at the after-meeting had any indicia of truthfulness
because, according to his testimony, Clark had absolutely no reference to judge the
veracity of any statement he received. On the other hand, in St. Amant, the defendant had
substantial evidence upon which he could judge the veracity of his source:
St. Amant made his broadcast in June 1962. He had known Albin since
October 1961, when he first met with members of the dissident Teamsters
faction. St. Amant testified that he had verified other aspects of Albin’s
information and that he had affidavits from others. Moreover Albin swore to
the answers, first in writing and later in the presence of newsmen. According
to Albin, he was prepared to substantiate his charges. St. Amant knew that
Albin was engaged in an internal struggle in the union; Albin seemed to St.
Amant to be placing himself in personal danger by publicly airing the details
of the dispute. 
 
390 U.S. at 733, 88 S.Ct. at 1326-27.
 
          At best, Clark repeated in writing a false, scandalous rumor consisting of trumped
up felony charges, convictions, and imprisonment in furtherance of removing Jenkins from
office. At worst, Clark made up or imagined the felony charges, convictions, and
imprisonment of Jenkins to further a predetermined result. In either instance, Jenkins has
established Clark acted with “actual malice” by clear and convincing evidence. 
Conclusion
          Clark’s sole issue and the subparts thereto are overruled. Accordingly, we affirm
the judgment of the trial court.
                                                                                      Patrick A. Pirtle

                                                                                            Justice



Quinn, C.J., concurring in result only.           


APPENDIX

 
DATE: Thursday, November 20, 2002

MEMORANDUM FOR: Ms. Daisy Evella Joe, CEO, B.C.J.L.O. Incorporated

                                                The Honorable Pete Sessions, United States Representative

                                                United States Department Of Justice – Civil Rights Division

REASON: Murder and Intimidation of Black Citizens in Athens, Texas
(Henderson County)

FROM:Paul Martin Clark, President, B.C.J.L.O. Incorporated

 
The City of Athens, Texas (Pam Burton–Athens City Manager) extended an
invitation to the Blacks in North Athens to discuss a pattern of murders and
intimidation of Athens Black Residents by the Police Force of Athens. The
Workshop as they labeled it was to be held at the Athens City Hall at 11:30
a.m. on 501 North Pinkerton Street (Annex Building). The Reverend Charles
Stovall, Pastor of the Camp Wisdom United Methodist Church of Dallas, 12
Black Residents of Athens and myself were in attendance. The workshop
never took place and was a mere future agenda item in their regular Athens
City Hall Meeting Session. Only 3 people were allowed to speak. So, as you
can see it lasted for only 9 minutes. One additional black resident attempted
to speak and was abruptly cut off by Athens Mayor Jerry King who asked all
of the black residents to leave the building because they had other city
business to discuss. Mayor King also vented extreme hatred by telling the
entire group of black Athens citizens that he did not appreciate them inviting,
“OUTSIDERS” like Reverend Stovall and myself. He told us, the black group
to speak with new Police Chief Jim Vance individually and not as a group. 
Here are some observations that need attention and immediate action by
Congress and the Justice Department.

1. The memorandum of Agreement and Understanding between The Athens
Police Department and the Black Citizens of Athens is null and void. It was
signed by the former Police Chief of Athens Dave Harris who retired and still
runs the Athens Police Department in an ex-officio capacity as a paid
consultant. All memorandums of agreement and understanding are not
recognized by law because they are not a law, rule or regulation.

2. The new police chief of Athens came from Garland, Texas Police
Department which has a long standing legacy of hatred and abuse of black
citizens. Athens Police Chief Jim Vance was at the helm of the Garland
Police Department when a black pharmacist from the Eckerd’s Drug Store
in Garland was beaten beyond recognition by a Garland Police Officer in
1999. Athens in effect recruited a police chief with racist credentials to
continue the legacy of unchecked murder of black citizens in Athens.

3. No one from Congressman Pete Sessions Athens office or East Dallas
Office showed up at the so-called workshop. The citizens called
Congressman Pete Sessions toll free number in Dallas and never received
a call back. There is a perception on the part of these citizens that the staff
of Congressman Sessions Athens office has ties to the local Ku Klux Klan
chapter in Athens and are large wealthy contributors to Congressman Pete
Sessions election campaigns. 

4. The only black female Athens City Council member is Gladys Elaine
Blanton Jenkins. She is a convicted felon having served prison time in
Texas and California for Prostitution and Drugs. She is controlled by Athens
Mayor Jerry King. No one in the State of Texas can hold elective office who
has felony convictions. She must be removed from office immediately.

5. A black man was killed by the Athens Police some three weeks ago. 
Nothing was investigated.

6. Shaneque Tilley, a black female from Athens (DOB 7-22-1982) was
arrested by the Athens Police as the (sic) crawled into the window of Tilley’s
North Athens home. The Athens Police beat her as she was 9 months
pregnant and killed her unborn child who was aborted. Tilley is now chained
naked to a prison bed in the Athens City Jail (Henderson County Seat),
bleeding, has no access to medical care or sanitary napkins. We asked
Mayor Jerry King to give us access to Tilley–he denied it. Tilley is also not
allowed any bond from a black bail bondsman named Barbara and Clyde
Bowman Sr. who can be reached at (903) 675-5474. No hospital or doctor
for a woman that had a miscarriage of a child at the brutal hands of the
Athens City Police.

7. The Athens Police intimidate, harass and murder black residents on a
daily basis. They come out of their police cars and approach black teens
with their weapons drawn. They follow black residents around the city, pulled
over Ms. Barbara Bowman who had prom dresses. dumped the prom
dresses into the grass and then stomped over them to make them unusable. 
They ticket black citizens even if they don’t turn on a car turn indicator 100
feet from the stop sign to increase revenue and land all black into the jail
system. They intimidate black older citizens of Athens calling them nigger
girl and nigger boy. Ms. Bowman has a list of all the black citizens in Athens
that have been murdered by the Athens police and the Klan who are one in
the same.

8. Peaceful picketing is not allowed in Athens and it is a law. If blacks
picket, they will be met head on by Athens Police. The Police have taunted
Ms. Bowman in Court during Trial in Judge Elaine Coffman’s Court.

9. Lee Alcorn, of the Coalition of Civil Rights took $6,700 from the black
citizens of North Athens to represent them. He turned around and sold their
confidential information to Mayor Jerry King and the outgoing Athens Police
Chief. Now these citizens are targeted by the Police. 

10. Councilwoman Elaine Jenkins threatened Mrs. Barbara Bowman
because Mrs. Bowman called radio station KNON in Dallas and spoke about
how the Athens Police were killing blacks and torturing them on a routine
basis.

11. The Athens police does racial profiling. The only people punished in
Athens Teen Court are blacks. The other white kids that get in trouble just
merely pay a fine and never appear in court.

12. Mayor Jerry King refused to give the black citizens of Athens the
minutes to the meeting. We demanded and he stated that 10 copies was
basically too much. We would have to come back because the feeder on the
Xerox machine was not working properly and would have to be manually fed. 
A woman whose son was murdered by the Athens Police is not allowed to
visit her birthplace which is Athens, Texas. She can not visit her elderly
mother. The last time she visited Athens, she was at the Dollar General
Store, confronted by the Police and told to leave. Her elderly mother was
visited by the Athens Police and threatened. 

 
In closing, it was best summed up by Reverend Charles Stovall. “The
Athens Police Force is responsible for the suffering and intimidation of Black
citizens. The memorandum and it’s (sic) revisions mean nothing to the City
of Athens and the Police Force. Mrs. Bowman was not even listed on the
Bonding List and the Police Chief issued her a letter of Apology. We do not
know if Ms. Tilley is alive or dead.

 
Signed,



          /s/

 
Paul Martin Clark

President

BCJLO Inc. (214) 328-3722